Gus F. MUTSCHER, Jr., Appellant,

v.

The STATE of Texas, Appellee.

S. Rush McGINTY, Appellant,

v.

The STATE of Texas, Appellee.

Thomas C. SHANNON, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 48160–48162.

Court of Criminal Appeals of Texas.

Sept. 24, 1974.

Rehearing Denied Nov. 6, 1974.

Frank Maloney, Austin, Richard Haynes, Houston, Davis Scarborough, Abilene, for Mutscher.

A. L. Rhodes, Abilene, and W. James Kronzer, Houston, for McGinty.

Joe Shannon, Jr., Fort Worth, and Bob R. Hanna, Abilene, for Shannon.

Robert O. Smith, Dist. Atty. and Stephen H. Capelle, Asst. Dist. Atty., Austin, Ed Paynter, Dist. Atty., Patricia A. Elliott and Billy John Edwards, Asst. Dist. Attys., Abilene, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

MORRISON, Judge.

The offense is conspiracy among two Members of the House of Representatives and a state employee to accept a bribe with the understanding that the two Members would use their vote, influence and powers of their office to procure and assist in the passage of certain legislation which thereafter would be brought before them in their official capacities, in violation of Article 159, Vernon's Ann.P.C.[1]; the punishment as to each appellant, five years probated.

The parties to the events which resulted in this prosecution were:

Gus F. Mutscher, Jr.,—Speaker of the Texas House of Representatives

Thomas C. Shannon—a sixteen year veteran of the Legislature

S. Rush McGinty—Executive Assistant to Speaker Mutscher

Gus F. Mutscher, Sr.—father of Speaker Mutscher

F. C. Schulte—Administrative Assistant to Speaker Mutscher

Frank W. Sharp—Chairman of the Board of Sharpstown Realty Company; Chairman of the Board of Sharpstown State Bank; Chairman of the Board of National Bankers Life Insurance Company

---

1. Although appellant McGinty was not an "officer" subject to the bribery statute, Article 159, supra, he was convicted of conspiracy, not bribery. Clearly, he may be so prosecuted. (See Nisbet v. State, 170 Tex. Cr.R. 1, 336 S.W.2d 142, wherein the defendant conspired with an "officer" to accept a bribe, similar in this respect to the case at bar.) An individual may also be prosecuted under the law of principals for the substantive offense of bribery under Article 159, supra, regardless of his status as an "officer". In the case at bar, however, it is not necessary to invoke the law of principals because appellant McGinty was convicted on the basis of his direct participation in a conspiracy, an offense not statutorily limited to "officers."

Father Francis Kennelly—Jesuit priest and honorary director of Sharpstown State Bank

Joseph Novotny—Executive Vice President of Sharpstown Realty Company; President of Sharpstown State Bank.

Initially, appellants challenge the sufficiency of the evidence.

The State's theory of this case is that Mutscher heard of Sharp's interest in an individually licensed state banking insurance supplemental to or in lieu of Federal Deposit Insurance. Mutscher approached Sharp about buying into one of Sharp's enterprises (Bankers Life Insurance) on credit and at the same time dangled the bait of passing Sharp's pet deposit insurance bill. When Sharp responded to these advances, Mutscher then made it known to Sharp that he was not alone in this venture and needed the help of his fellow legislator Shannon.

In order to determine whether this theory has been supported by the evidence, we summarize from the testimony of several witnesses:

The witness Novotny described Sharp as "probably a genius in many areas, but as far as terminology in the banking business, he didn't know the difference in an overdraft and a cash item." He stated that Sharp owned Sharpstown Realty Company, National Bankers Life Insurance Company and a "spin off" corporation, Master Control, and the Sharpstown Bank. He described Sharp as a braggadocious person who talked very much about his acquisitions. He stated that on one occasion Sharp predicted he would drain a swamp in Louisiana and build a city where the swamp had been, and mentioned other farfetched ideas such as building a city the size of Wichita Falls on his ranch near Junction. Another time Sharp discussed how he might acquire Braniff Airways and Royal Dutch Oil Company.

From other witnesses we learn that Sharp had given stock to the Jesuit Order and to such important personages as astronauts.

Sharp testified that prior to and at the time involved in this case, his bank, Sharpstown State Bank, was having trouble with the State Banking Department and the Federal Deposit Insurance Corporation, as they had been very critical of the loans of his bank. He was interested in getting his plan for bank deposit insurance adopted into law and frequently made this known to Mutscher in person and by letter. Soon thereafter they met privately in Houston at which time Mutscher told Sharp of some personal financial losses he had experienced in a "Siboney" stock deal, and he "dwelt on that considerably."

We quote further from Sharp's testimony:

"And as I was leaving, he [Mutscher] said more or less in a by the way manner, 'How is National Bankers Life coming along'—and he made the remark that he might buy some of the stock himself."

Two or three days later in a telephone conversation Mutscher informed Sharp he and his associates wanted to buy stock in National Bankers Life and asked permission for his father to buy some also. Mutscher told Sharp that in order to make the purchase, some sort of financing would be required. Sharp indicated to Mutscher that financing arrangements might be available through Sharpstown State Bank. Sharp later contacted Novotny, Sharpstown State Bank President, and gave his "blessing" to the loans.

The purchases were soon thereafter effected with the purchasers executing notes which can only be described as unsecured notes, since they were accompanied only by appellants' financial statements as collateral. Prices paid for the stock by appellants ranged from 11⅛ for Shannon and McGinty to 13 for Mutscher. The size of the loans obtained by these appellants and the unsecured nature of the loans have even more significance when viewed in the light

of the extensive scrutiny the bank was under from several fronts.

The amount of the loans taken out by each appellant, the number of shares purchased, and subsequent profits are shown on Table One.[2]

At Sharp's suggestion, the bank deposit insurance bills were then prepared and delivered to appellant Shannon at the House of Representatives. On September 9, the legislation passed and Mutscher called Sharp and told him of the passage of the bills. On September 10, Mutscher called Sharp and told him he wanted to sell the stock. The same day Sharp began to manufacture a market for the stock by getting in touch with Kennelly.

The Jesuits at this time held 20,000 shares of Sharpstown Bank stock which they wanted to sell for $50 per share. Sharp had advised the Jesuits that he would find a buyer for these shares and had further encouraged the Jesuits to invest the resulting million dollars in National Bankers Life stock. Father Kennelly's presence at the bank on September 11 was for the purpose of following through with this arrangement.[3]

The sale by these appellants was made the next day, September 11. The price was $20 a share.[4]

On September 10, Sharp realized that on the following day he had to be able to sell close to a million dollars in bank stock in order to pay off his political associates.[5]

We now come to appellant Shannon's participation in the conspiracy. In one of the earlier meetings, Mutscher had told Sharp he was not very well versed in insurance matters himself, but had an associate who was well informed on such matters and before they moved any further he would need Shannon's opinion. When the bills were prepared, they were delivered to Shannon's office in the Capitol. Shannon presented the bills at the committee meeting and secured their approval by the committee. After leaving the committee meeting, Shannon, after being recognized by Mutscher on the floor of the House, got the bills passed by the House. Shannon was in Houston at Sharpstown State Bank

2.

| | LOAN | SHARES OF STOCK PURCHASED JULY 28, 1969 | SHARES SOLD | SUM RECEIVED FROM SALE OF SHARES TO JESUITS SEPT. 11, 1969 | PAYOFF OF LOAN WITH INTEREST | PROFIT |
|---|---|---|---|---|---|---|
| MUTSCHER | $130,250.00 | 10,000 shares | 7,500 | $150,000.00 | $131,634.56 | $18,365.44 |
| MC GINTY | $ 45,929.38 | 4,115 shares | 3,000 | $ 60,000.00 | $ 46,417.60 | $13,582.40 |
| SHANNON | $ 45,929.38 | 4,115 shares | 3,500 | $ 70,000.00 | $ 46,417.60 | $23,582.40 |

3. Over a period of some years Sharp and Father Kennelly had been intimates. Sharp had been a benefactor of the Jesuit Order in Houston, and they in turn had begun to lend him large sums of the Order's money. Though times were good for a while, in the end the Jesuits lost at least $265,000 on National Bankers Life stock.

4. The evidence showed that Bankers Life stock was selling for 14¾ on the day that Sharp created a market for the sale at 20 of nearly a million dollars of stock held by Sharp's political associates.

5. By the term Sharp's political associates, we mean those people who sold their stock at $20 a share on September 11, and 12, at this sale arranged by Sharp. The following people sold 19,800 shares for a total of $396,000, to-wit:
 Gus F. Mutscher, Jr.
 Thomas Shannon
 S. Rush McGinty
 Gus F. Mutscher, Sr.
 F. C. Schulte

on September 11, the payoff day for Sharp's political associates.

Appellant McGinty was in telephonic conversation with Sharp approximately once weekly for the first six months of 1969, just prior to the introduction and passage of the legislation, and he, like Shannon and Mutscher, bought, sold and reaped large profits from the stock transaction.

Each of the three appellants submitted financial statements which were not checked prior to the making of the loans. Novotny testified that each financial statement was so indefinitely drawn that it could not have been checked for validity without more details. No effort was made to secure such details.

In support of their contention that the evidence is insufficient to support this conviction, the appellants rely in part upon Norris v. State, 165 Tex.Cr.R. 38, 302 S.W.2d 135. The indictment in Norris, supra, named the County Judge and the Commissioners, saying that they conspired "together with Raeburn Norris" to convert $5,000.00.

In Norris v. State, supra, we said:

"The county judge and one of the county commissioners named in the indictment, as defendants and parties to the conspiracy, were called as witnesses by the State and, after the prosecution against them had been dismissed by the State, testified in effect, that the commissioners court had never ordered the $5,000 warrant drawn and that the county was not, at the time, indebted to the San Diego State Bank in any amount.

"It is interesting to note that in the examination of these two witnesses, the State did not inquire of them if they had entered into the alleged conspiracy with him (the appellant), as the State had charged in this indictment against him.

"The fact that the witnesses did not attest the existence of the conspiracy, as the State charges in the indictment, is a strong circumstance that they would not so testify and therefore that there was no conspiracy as alleged."

In the case at bar, as distinguished from the witnesses in Norris v. State, supra, Sharp was not named as a conspirator. It should be noted that the pleader was careful to allege that the agreement was among the three named appellants only for the purpose of soliciting from Sharp a bribe for which they would use their influence to secure the passage of the legislation.

When the appellants accepted their positions of trust, they were charged with the knowledge that the law prohibited them from certain types of conduct. A part of this prohibited conduct was that they might not enter into an agreement to assist in the passage of legislation in exchange for a reward.

Under this indictment, the State was required to prove only that an agreement among the appellants had been made. The proof, however, showed the agreement, the passage of the legislation, and that the appellants were rewarded for the same.

Surely the facts before us here have met the test set forth in Feigenbutz v. United States, 8 Cir., 65 F.2d 122, at page 124:

"Conspiracy is an offense which can ordinarily be established only by a great number of apparently disconnected circumstances. Necessarily the existence of the conspiracy in most cases can be made to appear only inferentially from the acts of the parties committed in furtherance thereof."

These facts stand out in this case:

1. Sharp had frequent conversations with Mutscher and McGinty concerning Sharp's desire for bank deposit insurance and related to them the problems he was having with bank examiners. Mutscher expressed a strong need to consult with his associate, Shannon, and stated that he

would make no move without first consulting with Shannon.

2. Mutscher informed Sharp that he (Mutscher) and his associates wanted to buy some National Bankers Life stock and get it financed.

3. Sharp arranged for the stock purchases and "questionable" loans to finance these purchases for all three appellants through Sharp's bank. All three appellants purchased stocks on the same day by virtue of Sharp's arrangements.

4. Shannon accepted the bills for introduction and became the sponsor in the House of Representatives of the legislation Sharp desired. Mutscher, as Speaker of the House, recognized Shannon for the purpose of the passage of the legislation.

5. Within a two day period the legislation was passed; Mutscher so informed Sharp; Mutscher told Sharp he wanted to sell the stock; and all three appellants' stock was sold.

6. Sharp arranged a sale of the stock through a personal connection at a significantly inflated value within two months of its purchase.

7. Mutscher and Shannon were together in Houston at the bank to collect on the stock sale.

8. All three appellants profited handsomely from these stock transactions.

We can only conclude that the evidence was clearly sufficient for the jury to find that appellants had entered into a conspiracy to accept a bribe from Sharp in exchange for which they were to assist in the passage of legislation Sharp wanted.

Ground of error II urges that the court erred in refusing to quash the indictment in that the offense charged was in violation of the Speech and Debate clause, Article III, Section 21, of the Texas Constitution, Vernon's Ann.St., and the Due Process clause of the United States Constitution.

Omitting the introduction and preliminaries, the indictment charges that the appellants:

"Did unlawfully conspire, combine, confederate, and enter into a positive agreement together and between themselves and with each other to accept and agree and consent to accept a bribe and bribes, the said Gus F. Mutscher, Jr., and Thomas C. Shannon then and there being legislative officers of the State of Texas to-wit: members of the House of Representatives of the State of Texas and the said S. Rush McGinty then and there being a state employee employed as an administrative assistant to the said Gus F. Mutscher, Jr., in that they all agreed together and between themselves and each other to accept a thing of value, privilege and personal advantage, to-wit: loans and the use of money provided by Frank Sharp from the Sharpstown State Bank of Houston, Texas to the said Gus F. Mutscher, Jr., Thomas C. Shannon and S. Rush McGinty and the said Gus F. Mutscher, Jr., Thomas C. Shannon and S. Rush McGinty did then and there agree together and between themselves and each other that said loans would be accepted from the Sharpstown State Bank as aforesaid with the agreement and with the "understanding with the said Frank Sharp that the said Gus F. Mutscher Jr., and Thomas C. Shannon would use their vote and influence and powers of their offices as aforesaid to procure and assist in procuring the passage of certain legislation which might thereafter be pending and which might be brought before them in their official capacities concerning and pertaining to legislation providing for the creation, operation and regulations of corporations to provide deposit insurance for certain bank deposits within the State of Texas, which understanding and agreement was in violation of the duty of the said Gus F. Mutscher, Jr., and Thomas C. Shannon as legislative officers as aforesaid."

**914**

Appellants' motion to quash the indictment reads as follows:

"By way of further grounds herein, defendants would show to the court that any trial or conviction herein would be in violation of Article III, Section 21, of the Constitution of Texas, the 'privileges and immunities clause' and the 'due process clause' of the Fourteenth Amendment to the Constitution of the United States."

We know of no authority supporting that bold proposition set out in this motion. We are at a loss as to how a trial judge might properly respond to a motion which told him no more than did this at the time it was presented. Clearly he was not in error in overruling the motion prior to any evidence being produced.

Appellants' contention *which has been amplified since trial*, is now that certain provisions of the State and Federal Constitutions bar any inquiry into the vote of a Legislator or the motivations behind that vote. Appellants' claim that the so-called Speech and Debate clause of the Federal Constitution bars this prosecution is based on United States v. Johnson, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681, cert. denied, 397 U.S. 1010, 90 S.Ct. 1235, 25 L.Ed.2d 423; United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507; and United States v. Dowdy, 479 F.2d 213, cert. denied, 414 U.S. 866, 94 S.Ct. 132, 38 L.Ed.2d 118.

None of these cases hold that the Federal Constitutional immunity bestowed on national legislators by Article I, Section 6, is applicable to state legislators through the due process clause of the Fourteenth Amendment.

Article III, Section 21, Texas Constitution, reads:

"Words spoken in debate.—No member shall be questioned in any other place for words spoken in debate in either House."

Article XVI, Section 41, Texas Const. reads:

"SEC. 41. Bribery and acceptance of bribes.—Any person who shall, directly or indirectly, offer, give, or promise, any money or thing of value, testimonial, privilege or personal advantage, to any executive or judicial officer or member of the Legislature to influence him in the performance of any of his public or official duties, shall be guilty of bribery, and be punished in such manner as shall be provided by law. And any member of the Legislature or executive or judicial officer who shall solicit, demand or receive, or consent to receive, directly or indirectly, for himself, or for another, from any company, corporation or person, any money, appointment, employment, testimonial, reward, thing of value, or employment, or of personal advantage or promise thereof, for his vote or official influence, or for withholding the same, or with any understanding, expressed or implied, that his vote or official action shall be in any way influenced thereby, or who shall solicit, demand and receive any such money or other advantage matter or thing aforesaid for another, as the consideration of his vote or official influence, in consideration of the payment or promise of such money, advantage, matter of thing to another, shall be held guilty of bribery, within the meaning of the Constitution, and shall incur the disabilities provided for said offenses, with a forfeiture of the office they may hold, and such other additional punishment as is or shall be provided by law."

Article 159, V.A.P.C., reads:

"Any legislative, executive or judicial officer who shall accept a bribe or consent to accept a bribe under an agreement or with an understanding that his act, vote, opinion or judgment shall be done or given in any particular manner or upon a particular side of any question, cause or proceeding which is or

may thereafter by law be brought before him, or that he shall make any particular nomination, appointment, or do any other act or omit to do any act in violation of his duty as an officer, shall be confined in the penitentiary not less than two nor more than ten years."

■ This Court is not prepared to hold that prosecution of a state legislator cannot be had under a statute which merely implements the *specific* mandate of Article XVI, Sec. 41, of our State Constitution, by holding that the statute is in conflict with a more *general* provision of our Constitution, namely, Article III, Sec. 21. We hold that the Bribery of an Officer Statute involved here, Article 159, is authorized by Article XVI, Sec. 41, and is not in conflict with Article III, Sec. 21.

There is still a third reason.

If we properly understand the holding of the Supreme Court of the United States in U. S. v. Brewster, supra, it is that the "Speech and Debate" clause of the Federal Constitution is no hurdle to a prosecution such as this before us here because, as the Supreme Court said:

"[T]he illegal conduct is taking or agreeing to take money for a promise to act in a certain way . . . Taking a bribe is, obviously, no part of the legislative process or function; it is not, a legislative act. It is not by any conceivable interpretation, an act performed as part of or even incidental to the role of a legislator. It is not an 'act resulting from the nature, and in the execution of the office.' Nor is it a 'thing said or done by him, as a representative in the exercise of the functions of that office.' "

The Supreme Court further said:

"To sustain a conviction it is necessary to show that appellee solicited, received, or agreed to receive, money with knowledge that the donor was paying him compensation for an official act. Inquiry into the legislative performance itself is not necessary; evidence of the Member's knowledge of the alleged briber's illicit reasons for paying the money is sufficient to carry the case to the jury."

The crime here charged was conspiracy to accept a bribe by an officer, and the evidence was sufficient to carry the case to the jury.

■ Ground of error III contends that certain legislative acts of appellant Shannon were improperly admitted in evidence because of the Constitutional immunities mentioned in the preceding ground of error.

When evidence of each of the acts enumerated in appellants' brief was offered, no objection was interposed. In Hinkle v. State, Tex.Cr.App., 442 S.W.2d 728, we said:

"An objection to admission of evidence must be specific and must state grounds of the objection. 5 Tex.Jur.2d, Appeal and Error—Criminal Cases, Sec. 41, p. 68; Alcorn v. State, Tex.Cr.App., 415 S.W.2d 666; Korb v. State, Tex.Cr.App., 402 S.W.2d 166; Smith v. State, Tex. Cr.App., 437 S.W.2d 835."

A constitutional ground may be waived by failure to object. Article 1.14, Vernon's Ann.C.C.P.; Boykin v. State, Tex.Cr.App., 504 S.W.2d 855; Lewis v. State, Tex.Cr. App., 501 S.W.2d 88; Spead v. State, Tex.Cr.App., 500 S.W.2d 112.

Ground of error IV contends that the court erred in failing to entertain appellants' motion to quash the indictments on the grounds that the statutes Articles 159 and 177, V.A.P.C. are "void for vagueness". Appellants' brief on this question represents a prodigious effort, without benefit of appropriate authority, to challenge the failure of the statutes to define every term contained therein. They cite no case in which a statute denouncing bribery has been held to be unconstitutional. The State, on the other hand, calls our attention to a decision from our sister state of Louisiana.

**916**

In State v. Smith, 252 La. 636, 212 So.2d 410, the Supreme Court of Louisiana upheld their "public bribery" statute against a similar attack as is before us here by saying that their statute stated:

"In clear and unmistakable language that the gravamen of the offense denounced —the act forbidden—is the giving or offering to give (as well as the acceptance or offer to accept) anything of present or prospective value to the specifically delineated public officer, employee, or official with the intent of influencing his conduct 'in relation to his position, employment or duty.' "

The United States Court of Appeals for the Second Circuit in U. S. v. Irwin, 354 F.2d 192, cert. denied 383 U.S. 967, 86 S. Ct. 1272, 16 L.Ed.2d 308, in passing upon an assertion that the Federal Bribery Statute, Title 18, Sec. 201(f), was vague and uncertain, said:

"The iniquity of the procuring of public officials, be it intentional or unintentional, is so fatally destructive to good government that a statute designed to remove the temptation for a public official to give preferment to one member of the public over another, by prohibiting all gifts 'for or because of any official act,' is a reasonable and proper means of insuring the integrity, fairness and impartiality of the administration of the law. It is clearly within the power of Congress to enact such a statute."

. . . . . .

"He must show that, as applied to his own case, the statute is so vague and uncertain that he was not presented with an 'ascertainable standard of guilt.' . . . The statute furnished adequate warning to anyone of ordinary intelligence that this kind of conduct embarked upon by the appellant would constitute an offense."

The Court concluded by saying:

"As long as the statute is clear as to the appellant's behavior, we need not be concerned that at the outer fringes of the statute's bounds there may be close or difficult cases."

■ We hold that Article 159, V.A.P.C., and its constitutional source, Article XVI, Section 41, Constitution of Texas, and Article 177, V.A.P.C., clearly furnish adequate warning to anyone of ordinary intelligence that the kind of conduct embarked on by appellants would constitute an offense.

■ By ground of error V appellants contend that Article 159, V.A.P.C. (as amended in 1957) is unconstitutional because the caption does not give notice of all of the changes effected by the act. The caption reads:

"An Act amending Articles 158 and 159 of the Penal Code of the State of Texas; re-defining the offense of bribery and offering a bribe; re-defining the offense of accepting and consenting and agreeing to accept a bribe; creating the offense of soliciting, or offering to accept, a bribe; designating the persons subject to the provisions of the Act; prescribing a penalty for violation; providing a savings clause; providing a severability clause; and declaring an emergency."

It is appellants' construction of this caption that it gives notice that a penalty has been prescribed for the offense of soliciting or offering to accept a bribe, but no notice that a penalty has been prescribed for the redefined offenses set forth earlier. With this we do not agree. The phrase "prescribing a penalty for violation" relates to each act theretofore set out in the caption.

They further contend that there was a change in the penalty and no notice thereof was given. Again we do not agree. When the caption states that two offenses were redefined and that a penalty was pre-

scribed, then the Legislature and the public were given all the notice that the Constitution requires.

In appellants' brief, they pose the question:

"The ultimate question to be resolved is:

'Does the title of the bill give fair notice of its contents?'"

We answer this question with a resounding "Yes".

■ Ground of error VI contends that the trial court erred in failing to quash the indictment because the same was too vague to give notice. They first contend that the legislation upon which appellants Mutscher and Shannon's vote was to be influenced was not described with particularity. The indictment charges in part:

"Certain legislation which might thereafter be pending and that which might be brought before them in their official capacities concerning and pertaining to legislation providing for the creation, operation and regulation of corporations to provide deposit insurance for certain bank deposits within the State of Texas."

It should be borne in mind that at the time the conspiracy was alleged to have been entered into, it was not known just what legislation was contemplated. The indictment was descriptive, but broad enough to encompass whatever proof might later develop.

■ They next contend that the indictment failed to inform the appellants of what duty was imposed upon them by law as officers of the Legislature. The indictment charges in part:

" . . . Which understanding and agreement was in violation of the duty of the said Gus F. Mutscher and the said Tommy C. Shannon as legislative officers aforesaid."

Appellants Mutscher and Shannon's duties as legislative officers were fixed by law and could not have been increased, diminished or altered by the indictment. The allegations in the indictment gave ample notice.

■ Lastly, they contend that the "loans" (which were yet to be made at the time of the creation of the conspiracy alleged in indictment) should have been described by number, date and type.

Merely to state the contention answers it. We find no merit in any of the three contentions.

■ Ground of error VII contends that the trial court erred by failing to quash the indictment on the ground that count one was duplicitous in that it charged two or more separate offenses within the count. This Court was confronted with a similar contention in Goldman v. State, 130 Tex.Cr.R. 471, 95 S.W.2d 423. There we said:

"When the three defendants entered into an agreement to bribe the witness to avoid service of process, it was by *one* agreement among the conspirators, *one* offer to the bribed witness, and *one* acceptance by the witness, and constituted but *one* act." (Emphasis added)

See also Nisbet v. State, 170 Tex.Cr.R. 1, 336 S.W.2d 142, cert. denied 363 U.S. 829, 80 S.Ct. 1601, 4 L.Ed.2d 1524.

This ground is overruled.

■ Ground of error VIII contends that the venue was not proven. Under Article 13.20, V.A.C.C.P., it is provided that a conspiracy may be prosecuted in either the county where it is entered into or where the same was agreed to be executed. Under the facts of this case, the State had the option of proceeding either in Travis or Harris Counties, either of which would have been proper. See Feldman v. State, 141 Tex.Cr.R. 306, 147 S.W.2d 773.

■ Ground of error IX contends that the Court erred in permitting the witness

Gilleon to testify that certain notations in State's Exhibits 52 and 53 were "communications." Sharon Gilleon testified that she was a secretary to Frank Sharp and as such kept two record books in which she listed telephone calls which Sharp would make and which would be made to him. She indicated that when a call had been completed, she would mark a line through the name of the person talked to and thus indicated that the call had been completed. All of this was admitted without objection. It was only when she later referred to certain "marked through" calls as "communications" that an objection was interposed. Since the testimony objected to conveyed to the jury no more information than they already had and did not reveal the nature and contents of such "cummunications", we perceive no error.

Ground of error X is that "the witness Novotny and Kennelly were permitted, over objection, to testify to conversations they had with Frank Sharp. (Record 4064–5; 4193)"

We quote from the record concerning this ground:

"Q (PROSECUTOR) But you received a list of names from Mr. Sharp?

A (NOVOTNY) Yes, sir.

Q What was your conversation with Mr. Sharp at the time he presented you with these names?

MR. MALONEY: I'm going to object to it as hearsay, unless the proper predicate is laid, Your Honor.

MR. SMITH: Your Honor, we thought we had argued this point before the Court the other day. We think it is admissible under the theory that was advanced to the Court out of the presence of the Jury the other day and we're offering it on that basis.

THE COURT: All right. You may go ahead."

[Counsel for each appellant note their exception]

"Q What do you recall about the conversation with Mr. Sharp, or what did you say, or what did he say, do you remember the gist of it, or what—

A As I recall, Mr. Sharp gave me the list of names. He told me to fund the loans with corresponding amounts beside each name. He told me to have loans typed in those amounts and to fund the loans. As I recall, he told me to have checking accounts opened and have the funds deposited in the accounts. And as I remember, he told me that I would get instructions as to what to do with the money later on.

Q Did you do anything subsequent to these instructions?

A Yes, sir, I gave the list to my secretary and told her the same thing that Mr. Sharp had told me."

We do not reach the question of whether the trial court was in error in permitting the testimony, because, if error, it does not call for a reversal.

The notes themselves were admitted in evidence without objection, and therefore the only error lies in admitting the testimony that Sharp told Novotny to "fund the loans." Elsewhere in the record we find that Sharp testified that when Mutscher called him about the stock to be purchased by him and his associates, the following occurred:

"Q And then did you do anything further and relative to him getting a loan at Sharpstown Bank without relating what the conversation was. Did you talk to anybody about that?

A Yes, I expressed a desire for them to get the loan to give my blessing, so to speak, so that they have the loan.
Q To who?

A Joe Novotny, who was the president of the bank at that time."

■ Since the same information which was originally objected to was later admitted without objection, nothing is presented for review. Amaya v. State, Tex.Cr.App., 473 S.W.2d 476.

The testimony of Kennelly relates to Sharp's request that Kennelly come to the bank on the next day for a certain purpose. Many other witnesses testified without objection that Sharp set up the meeting on this particular day with Kennelly for this certain purpose.

No error is reflected by this ground.

■ Ground of error XI contends that the witness Price was permitted to testify to hearsay. State's Exhibit 28, introduced through the witness Price, who was qualified as the custodian of such records, was a note signed by McGinty, which bore the abbreviation "F/S" under the printed caption "Name of co-maker, Endorser or brief description of collateral." The admissibility of the note itself is not questioned, but only the testimony of Price that the abbreviation "'F/S" meant that the note was made upon the basis of a financial statement. We need not pass upon the hearsay contention because later in Price's testimony she stated in reply to the appellants' counsel's question that the collateral on the loan in question was a financial statement.

No error is presented here. Yates v. State, Tex.Cr.App., 488 S.W.2d 463.

Ground of error XII contends that the court erred in permitting the witness Stewart to testify concerning his interpretation of the State's Exhibit 56 (House Bills 72 & 73) which was the bank deposit legislation here in question, and give his opinion as to what effect it would have had on the banking industry in the State if it had become law.

Stewart was the Banking Commissioner of Texas and had been with the banking department since 1957, during which time he had experience with the interpretation of banking legislation. Over the objection that he was not an expert and was basing his opinion in part upon the opinion of other experts, he was permitted to testify that the way the bill had been draw, supervision of the deposit insurance program was entrusted to the Banking Board. He further testified that under the existing law the Banking Board was in no position to exercise supervision, because it had neither banking examiners nor authority or money to employ the same.

■ This was an opinion which might very logically have been given by a witness of Stewart's expertise, who had studied certain legislation which related to his field of government.

We find no merit in this ground.

Ground of error XIII presents the same contention as the preceding ground, but relates to an opinion expressed by the witness Kimberlin. He was the Executive Vice President of the Texas Bankers Association, a former counsel for the State Banking Department, and a lawyer who had been connected with the banking industry and the banking department since 1953. In connection with this and the preceding witness' testimony, it should be noted that House Bills 72 and 73 were merely proposed legislation which did not become law because they were vetoed by the Governor.

■ The witness Kimberlin was permitted to testify that in his opinion had the bills become law, certain State chartered banks would have been permitted to operate without supervision from the Federal Deposit Insurance Corporation.

This likewise appears to have been an opinion which the witness was amply qualified to give.

Ground of error XIV relates to the refusal of the court to permit Defendants' Exhibit 20 in evidence.

■ An examination of the record fails to reveal a copy of Defendants' Ex-

hibit 20, therefore nothing is presented for review.

Appellants contend that they were injured by the refusal to admit such exhibit because it would have shown that another bill, House Bill 78, had passed through the Legislature with the same rapidity as had House Bills 72 and 73 (the ones involved in this prosecution). We observe that appellants were not injured because in his tender thereof, counsel got before the jury all the facts which he claims the bill would have shown. We quote from the record:

"Q (Counsel for appellants) Defendant Shannon's # 20 purports to be a record from the Calendar Clerk of the House of Representatives on House Bill 78 showing House Bill 78 to have been introduced September 6, passed, or reported favorably from committee on September 8th, the same day we've been about, suspended the rules and passes the House and the Senate on September the 9th, do you recall that Bill, sir?

A Yes, sir, very well.

Q All right. And who was the author of that Bill?

A Patterson.

Q Is that you?

A Yes, sir.

Q All right."

This ground of error is overruled.

▬▬▬ Ground of error XV complains of the granting of the State's motion in limine preventing appellants from inquiring about federal indictments pending against the State's witness Novotny. Although Article 38.29, V.A.C.C.P., prohibits an inquiry into accusations against a witness which have not ripened into convictions, appellants assert a constitutional claim under the Confrontation Clause of the Sixth Amendment to the U. S. Constitution.

Initially we express the most serious doubt whether appellants have preserved the error, if any. Appellants rely solely upon the testimony of Novotny's attorney to show the evidence proffered. Recently in Fletcher v. State, Tex.Cr.App., 437 S. W.2d 849, we said:

"While we are in full accord with the appellant that great latitude is allowed an accused in showing any fact which would tend to establish ill feeling, bias, motive, and animus upon the part of any witness testifying against him and that he is not restricted to any one method of so showing, we cannot agree that the best evidence of the pendency of a lawsuit and the allegations in the pleadings therein as to certain individuals is the testimony of an attorney involved."

In the case at bar the indictments against Novotny were not introduced and are not made a part of the record.

It was the position of defense counsel at trial that he was satisfied and did not desire to further pursue the efforts to prove the indictments against Novotny once he received the assurance from the prosecutor in charge of this case, that the prosecutor had made no representations or promises to the witness Novotny that he would intercede with those in charge of the Federal prosecutions against Novotny in exchange for his testimony in the State court in this case.

The failure of appellants to develop what the testimony of Novotny would have been on their bill of exception is especially significant in that appellants are relying on the constitutional right to cross examine a witness under the Confrontation Clause. In Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347, (1974), the Supreme Court of the United States set out the problem as being a right to impeach a witness by cross examination.

No testimony about these indictments or their effect on Novotny's testimony was ever elicited from Novotny. No attempt was made to show that there was an admitted bias on the part of Novotny.

Lastly, we note that no effort was made to show to the trial court how Novotny's testimony was harmful to them. The difficulty we are having in perceiving any harm when we have the entire record before us in retrospect would have been an even more difficult task for the trial court without the benefit of aid from appellants' counsel.

Appellants developed evidence in the absence of the jury from Novotny's attorney that Novotny was under indictments in federal court. By supplemental brief filed with our permission after this case was submitted, appellants seek to cast the witnesses Sharp and Novotny into roles reversed from those portrayed at trial. The trial court charged the jury that Sharp was an accomplice witness as a matter of law, but submitted no charge as to Novotny.[6] Now appellants urge that Novotny, not Sharp was the chief culprit and that it was vital for this reason that appellants be allowed to impeach him. Such a position is essential to take advantage of the decision of the United States Supreme Court in Davis v. Alaska, supra, which was decided after the trial of this case.

*Davis,* supra, is based on a defendant's constitutional right to show bias of a State's witness. The Supreme Court was confronted with a situation whereby a crucial State's witness, Green, an adjudged juvenile delinquent, who was on probation therefor, was a likely suspect in the very crime alleged against the defendant.

The Supreme Court stated:

"The claim of bias which the defense sought to develop [the juvenile delinquency adjudication] was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status of a probationer, cf. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), as well as of Green's concern that he might be a suspect in the investigation."

No such ominous and immediate pressures enveloped the witness Novotny in the case at bar. The indictments themselves do not show bias, but only serve as a circumstance from which bias can be inferred. The question then becomes whether in addition to the indictments there are other surrounding circumstances from which bias can reasonably and palpably be inferred. We have concluded that there are not. Appellants contend that the same or similar pressures are present as in *Davis.* In Davis the counsel for accused pressed for specific answers which would have shown Green's possible bias. There was no such effort in the case at bar. We find the circumstances too remote to provide a basis for any reasonable inference that Novotny was biased.[7]

We find a further vital distinction from *Davis.* Novotny was by no means a key witness in the case at bar as was Green in *Davis.* Novotny's testimony contributed no vital information that was not already before the jury from other witnesses and documents which were admitted without objection. This, we conclude answers appellants' suggestion *just now asserted* that "many statements made by the protected witness Novotny were crucial to the jury's decision."

Novotny's role is best described by quoting again from him as we did in discussing ground of error X:

"A. Yes, sir. I gave the list to my secretary and told her the same thing Mr. Sharp had told me."

By this we mean that Novotny exercised no independent judgment in the making of the loans. He states at the beginning that he had no authority to make a loan in excess of $10,000, and that what he did was done at Sharp's direction. There is noth-

---

6. We have elsewhere in appellants' Ground of Error XX pointed out appellants' failure to object to the charge in this respect.

7. Wigmore, Vol. 3A, Bias, Section 951.

ing in the record to demonstrate that he was in error in so describing his role.

To appraise appellants' contention, we look to Sharp's testimony. As we have related earlier, Sharp testified that his family owned Sharpstown Realty Company, which in turn owned more than 50 percent of Sharpstown State Bank. He further testified that as Chairman of the Board he "worked as a team" with Novotny, the President of the Bank. Sharp felt that Novotny "would respond by doing what I wanted them (Osorio and Novotny) to do." He testified that "I expressed the desire (to Novotny) that they (Mutscher and his associates) get the loan or gave my blessing, so to speak, that they have the loan."

Appellants now assert that the real issue is "who granted the loans, Sharp or Novotny." And yet they did not cross examine Sharp or Novotny on this point.

Since Novotny was not a principal witness, as was Green, the proof of the criminal charges against him was not paramount to the State statute which our Legislature has determined advances the truth seeking process.

We find first that the error, if any, is not preserved.

We find next that the court did not err in declining to permit the jury to hear about the indictments against Novotny.

By ground of error XVI appellants contend that the court erred in permitting certain business records to be introduced when the requirements of Sec. 1 of Art. 3737e, Vernon's Ann.Civ.St. had not been complied with.[8] Both the appellants and

the State rely upon a recent opinion of this Court in Coulter v. State, Tex.Cr.App., 494 S.W.2d 876. Such reliance is misplaced. In Coulter, the State had laid a predicate as required by Art. 3737e, supra, before the records were admitted and that was not a controverted issue. There the record which we held had been erroneously admitted was not the record prepared in the course of normal business activities. We were concerned with the authenticity of certain police records which contained inadmissible hearsay by which the State sought to establish the ultimate fact necessary to be proven to establish the guilt of the accused.

■ Irrespective of Article 3737e, supra, the rule has always been that where evidence which would otherwise be inadmissible is proven by some other testimony which is not objected to, no reversible error is shown. Melton v. State, Tex.Cr.App., 508 S.W.2d 104 (1974), Carew v. State, Tex.Cr.App., 471 S.W.2d 860; 5 Tex.Jur. 2d, Appeal and Error—Criminal, Sec. 446.

■ The same information contained in the business records in question were presented by other witnesses without objection. The records contain many instruments reflecting the stock transfers. Evidence of these stock transfers had been admitted without objection through the witnesses Jordan, Price, Kennelly and Novotny. We further observe that the fact of the stock purchases was fully developed by defense counsel in their cross examination of the State's witnesses.

The fact that some of these records also contained information such as age, social

---

8. Art. 3737e, V.A.C.S. Memorandum or record of act, event or condition; absence of memorandum or record as evidence.
 Competence of Record as evidence
 Section 1. A memorandum or record of an act, event, or condition shall, insofar as relevant, be competent evidence of the occurrence or the act or event or the existence of the condition if the judge finds that:
 (a) It was made in the regular course of business;

(b) It was the regular course of that business for an employee or representative of such business with personal knowledge of such act, event or condition to make such memorandum or record or to transmit information thereof to be included in such memorandum or record;
 (c) It was made at or near the time of the act, event or condition or reasonably soon thereafter.

security number, occupation, income and business address in no way incriminated the appellants.

By ground of error XVII appellant complains of the introduction of State's Exhibits 101 and 102. These exhibits are charts which depict the price fluctuations of stock in National Bankers Life Insurance Company and its "spin off" corporation, Master Control, Inc., during portions of 1969.

The record is replete with testimony from other sources concerning the purchase and sales of such stock during the period covered by the charts. If error, the charts are clearly harmless error.

Ground of error number XVIII is as follows:

"The District Attorney materially and prejudicially affected Defendants' right to a fair and impartial trial by three times injecting incompetent evidence into the trial and then withdrawing same."

We find this ground of error to be multifarious and not in compliance with Article 40.09, Sec. 9, V.A.C.C.P. In addition, we have examined each instance of alleged prejudicial conduct and find that in each instance appellants received all relief which they requested. Cazares v. State, Tex.Cr.App., 488 S.W.2d 110. Further, the matters complained of are not so fundamentally prejudicial as to call for reversal.

By ground of error XIX, appellant seeks to complain of at least six arguments of the prosecutor. Such a ground of error does not comply with Art. 40.09, Sec. 9, supra, and nothing is presented for review. Hunt v. State, Tex.Cr.App., 492 S.W.2d 540, and cases therein cited. We have examined each instance complained of and conclude that the prosecutor's argument was not subject to the interpretation that it was a comment upon the appellants' failure to testify.

Appellants complain that the State improperly argued to the jury that the appellants had failed to call certain witnesses; namely, a banking expert, stockbrokers, or other experts, other members of the Legislature, the Governor, failed to introduce a report in possession of Clay Cotten and the Chairman of the House Banking Committee. We have only recently held that the State may comment on the failure of a defendant to call witnesses. Winkle v. State, Tex.Cr.App., 506 S.W.2d 891. There is no showing by the appellants that the named witnesses were not available or not within the subpoena power of appellants. The argument is not a comment on the failure of appellants to testify.

By ground of error XX, it is contended that the court erred in failing to submit in his charge the question of the witness Novotny's being an accomplice witness. We have examined the appellants' brief and the record with care and fail to find that the appellants ever called the trial court's attention to the objection they now seek to raise in this Court. The only objection to the court's charge on this ground which is set forth and relied upon in appellants' brief is as follows:

"The Court's charge, by instructing the jury that the Witness Schulte could be by the jury considered as an accomplice witness, comments directly on the testimony of the Witnesses Joe Novotny and Betty Jordan by omitting to instruct the jury that the witnesses Novotny and Jordan could be by the Jury considered as accomplice witnesses."

By no stretch of the imagination can it be said that this objected to the court's failure to submit the question of Novotny's being an accomplice witness. Winkle v. State, supra.

Appellants' objection to the charge is to the effect that the court comments on the testimony by charging that Schulte was an accomplice witness. Nowhere did appellants either object to the failure of the court to charge that Novotny was an ac-

complice witness or request a charge thereon. The objection made to the trial court is ambiguous and does not stand for the proposition appellants now assert on appeal.

Appellants' objections to the charge were voluminous and except for two handwritten pages, all objections were set out in typed form. The objection which is the basis for this ground of error is found on these handwritten pages among four other lengthy objections to paragraph twelve of the charge. If in fact these appellants wanted a charge as to Novotny's testimony, they should have told the trial court in unmistakable language.

In Garver v. State, 158 Tex.Cr.R. 585, 258 S.W.2d 812, we said:

"If an accused is dissatisfied with the court's charge, he should make his objection in specific terms, thereby clearly informing the court of what he wants or does not want in the charge."

Article 36.14, V.A.C.C.P., Charge of the Court, reads in part as follows:

". . . Before said charge is read to the jury, the defendant or his counsel shall have a reasonable time to examine the same and he shall present his objections thereto in writing, *distinctly specifying each ground of objection.*" (Emphasis added)

The error, if any, has not been preserved.

■ By ground of error XXI appellants objected to the portion of the court's charge in which he submitted to the jury the question of whether the witness Schulte was an accomplice witness.

˙At the beginning we observe that we have been cited no case which holds that it is error for the court to submit to the jury the question of a State's witness being an accomplice witness.

Schulte, an administrative assistant to appellant Mutscher, bought National Bankers Life stock when Mutscher did and sold at the same time and profited proportionately as did Mutscher. This points toward his being an accomplice witness. On the other hand, his testimony was that his purchase and sale of the stock were in the course of a normal business transaction, and he was completely unaware of any agreement to sponsor the legislation which was the crux of the conspiracy charged in this indictment. This could be said to point toward his not being an accomplice witness. In the face of this dilemma, we are not prepared to hold that the court erred in submitting the question to the jury.

By ground of error XXII complaint is made of that portion of the court's charge in which he applied the law to the facts and authorized a conviction if the jury found that the appellant made a positive agreement to accept a bribe, agreed to accept a bribe, or consent to accept a bribe. It is contended that the elements "agree to accept" ´and "consent to accept" had been elected out of the case by the first paragraph of the court's charge which told the jury that the appellants were charged with the offense of "conspiracy to accept" a bribe.

■ We are not impressed with the semantics and čonclude that the portion of the charge complained of followed the indictment and properly applied the law to the facts.

Ground of error XXIII complains of the refusal of the trial court to charge the jury as follows:

"You are instructed that the defendant Gus F. Mutscher, Jr., at the time he entered into an agreement with either the defendant Thomas C. Shannon or S. Rush McGinty, if he did enter into any agreement, must have had the specific intent to accept a bribe, and if you fail to so find beyond a reasonable doubt or if you have a reasonable doubt thereof, then you shall acquit the defendants and say by your verdict, 'not guilty'."

Appellant Mutscher did not testify nor did he offer any evidence which would raise an issue that even if he entered into an agreement with his co-conspirators to accept a bribe, he did not at the time have the specific intent to carry through on the agreement.

In the early case of Matthews v. State, Tex.Cr.App., 38 S.W. 172, the complaint was made that the trial court had refused to require the jury to find that the accused had the specific intent to steal when he entered the burglarized premises. In holding such charge unnecessary, the Court said, "There is not a shadow of testimony going to show that he entered the house for any other purpose whatever."

In the recent case of Machado v. State, Tex.Cr.App., 494 S.W.2d 859, the accused complained of the failure of the court to charge on specific intent to kill. We disposed of such contention with the observation, "Neither appellant testified at the guilt stage, and there was no evidence of a lack of intent to kill."

 Appellants rely primarily on Odneal v. State, 117 Tex.Cr.R. 412, 34 S.W.2d 595, a case involving a conspiracy by defendant and another to bribe a State's witness to absent herself from defendant's trial. The defendant requested a charge as to the co-conspirator's intention at the time he entered into the agreement with defendant to return the bribed witness for trial. The co-conspirator so testified on cross examination. The court held that the issue was raised by the testimony, and therefore, the requested charge should have been given. In the case at bar, the requested charge on specific intent was not supported by any testimony raising the issue.

The charge as a whole protected the appellants. It required the jury to find that each one entered into a positive agreement to accept a bribe or bribes and that there was a positive agreement to commit a felony. The court did not err in declining the requested charge.

Ground of error XXIV urges the following:

"The trial court reversibly erred by refusing to instruct the Jury not to consider the acts, conduct, or statements of the alleged co-conspirators outside the presence of the Defendant Mutscher as evidence against the Defendant Mutscher unless the Jury *first find* and believe beyond a reasonable doubt a conspiracy existed, to which conspiracy Defendant Mutscher was a party, and that the acts, conduct or statements of the alleged co-conspirators outside the presence of the Defendant Mutscher could not be considered by the Jury as evidence establishing said conspiracy." (Emphasis added)

The important words in the above quoted requested charge are "first find". A very similar requested charge was rejected by this Court in Steele v. State, 87 Tex.Cr.R. 588, 223 S.W. 473, where the accused had asked that the jury be told "before you can consider" any of the testimony of certain witnesses that the jury should find that a conspiracy had been entered into. This Court said that such a requested charge sought to announce an incorrect statement of the law.

In the same volume (87 Tex.Cr.R. 606, 223 S.W. 459) appears the famous case of Sapp v. State. There the substantive law is discussed as follows:

"The rule that a conspiracy must be established before declarations of co-conspirators are admissible against the appellant no longer obtains in this state, nor does the order in which evidence to show the conspiracy is admitted affect its admissibility."

In support of their position, appellants rely on the following cases: Chapman v. State, 45 Tex.Cr.R. 479, 76 S.W. 477 (1903); Anderson v. State, 87 Tex.Cr.R. 641, 224 S.W. 782 (1920); Stevens v. State, 129 Tex.Cr.R. 494, 88 S.W.2d 711 (1935); Posey v. State, 132 Tex.Cr.R. 268, 103 S.W.2d 763 (1937).

A discussion of these cases will not be necessary because in Sapet v. State, 159 Tex.Cr.R. 620, 266 S.W.2d 154 (1954), this Court reaffirmed the rule set down in *Sapp*, supra, that initial proof of a conspiracy is not necessary before acts and declarations of a co-conspirator are admissible. *Sapet* has by implication overruled the holdings in the cases relied on by appellants, as they apply to the charge in question.

When the substantive law was changed, the necessity for giving the requested charge ceased to exist. Since there is no longer any requirement as to the order of proof, a charge which has its basis in the order of proof is at variance with the law.

This, we conclude disposes of this ground of error; however, we make the following observations.

Appellants' requested instruction, which is somewhat different from his restatement of such in his ground of error, reads as follows:

"Before you can consider any evidence as to the acts, conduct, or statements, if any, upon the part of Thomas C. Shannon, S. Rush McGinty as evidence against Gus F. Mutscher, Jr., you must find and believe from the evidence beyond a reasonable doubt that the Defendant Gus F. Mutscher, Jr., did on or about the 22nd day of July, 1969, unlawfully combine, confederate and enter into a positive agreement together with Thomas C. Shannon, S. Rush McGinty to accept a bribe from the said Frank Sharp, as charged in the first count of the indictment, and this agreement and conspiracy, if any, cannot be proven by the acts and statements, if any, of Thomas C. Shannon and S. Rush McGinty made outside the presence of the Defendant, Gus F. Mutscher, Jr., and unless you find from the evidence beyond a reasonable doubt that the Defendant, Gus F. Mutscher, Jr., did enter into a conspiracy on or about the date charged in the indictment with the said Thomas C. Shannon and S. Rush McGinty, then you cannot consider any evidence as to the acts and conduct and statements, if any, of the said Thomas C. Shannon or S. Rush McGinty which are made in the Defendant Gus F. Mutscher, Jr.'s absence for any purpose whatsoever."

We note three separate propositions. The first proposition would require the jury not to consider all acts, etc., of the co-conspirators, *not just those made outside the presence of the appellant Mutscher* (until first finding other evidence of the agreement). Appellants' brief asserts that it is necessary to charge the jury ". . . not to consider the acts and declarations of co-conspirators *outside the presence of a defendant* unless they first find the existence of the co-conspiracy beyond a reasonable doubt." (Emphasis added.) Appellants' requested charge in its first part requested more than he was entitled to even under the law as it was set out in Posey v. State, 132 Tex.Cr.R. 268, 103 S.W.2d 763.

The second clause of appellants' requested charge would prohibit the jury from considering the acts and statements of the co-conspirators made outside the presence of the appellant Mutscher as evidence of the agreement. This portion of the requested charge is also not the law. Aguero v. State, 164 Tex.Cr.R. 265, 298 S.W.2d 822.

We find, therefore, that the appellants' requested charge was not in accordance with the law, was ambiguous and inconsistent, and the court was not in error in failing to so charge the jury.

Finding no reversible error, the judgments are affirmed.

ONION, P. J., and ROBERTS, J., concur in the results.