Earnest Martin ARMENTROUT,
Appellant,

v.

The STATE of Texas, Appellee.

No. 62235.

Court of Criminal Appeals of Texas,
Panel No. 1.

Feb. 9, 1983.

Terrence Gaiser, Jay W. Burnett, Houston, for appellant.

Carol S. Vance, Dist. Atty. and James C. Brough and Donald A. Smyth, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

Before ODOM, TOM G. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

Appeal is taken from a conviction for aggravated promotion of prostitution[1] obtained in a trial before the court; appellant's punishment was assessed at three years, probated, and a fine of $2500.00.

Because appellant's complaints are leveled at the admission of hearsay statements which were admitted over objection, apparently under the socalled "co-conspirator's exception," we recite the facts, omitting the content of those statements in order first to determine whether a conspiracy was established at all.[2]

Officer P.R. Lindsey[3] testified that he and Officer G.L. Grieger went to Golden Girls Modeling Studio—a place where "you can rent [totally nude girls] to talk to them, body paint them, take photographs"—on October 3, 1977. After speaking with a clerk, the officers and two models went into a large studio furnished only with two couches. On arriving in the room, according to Lindsey, "both of us immediately undressed." The women also undressed, apparently simultaneously. The four sat around and talked. Lindsey said they were

---

1. V.T.C.A. Penal Code, § 43.04, provides in relevant part:

   "(a) A person commits an offense if he knowingly owns, invests, finances, controls, supervises, or manages a prostitution enterprise that uses two or more prostitutes."

2. In three grounds of error appellant contends "the predicate was not laid to establish a conspiracy" and therefore the police officer witnesses were erroneously permitted to relate statements made by "other suspects arrested in the same transaction."

3. Lindsey testified "Paul Carr" was his "alias."

planning to have a bachelor party and asked whether "the girls would be able to deliver sexual favors to the officers due to the fact that the people that would be at the party were clients of mine and also Officer Grieger was a good friend of mine."

In addition to talking, Lindsey testified, "[w]e had camera equipment and attempted to take pictures, one, maybe two;" also, "[w]e sat on couches; and they allowed us to fondle them, their breasts and pubic areas. They were careful at the time not to touch us."

The officers went to the front desk and told the person there about the party they were planning, that they "wanted to rent four girls and that I didn't want the girls unless they would perform sexual favors for us." A large book containing photographs of women unclothed in varying degrees was brought to the officers who selected four women.

The next day, on October 4, Officers Lindsey and Grieger returned to the Golden Girl Studios where they spoke with an unfamiliar individual. The officers advised him the party was to be at the Shamrock Hilton, gave him the room numbers and requested that the women arrive at 8:00 p.m. that evening.

At 7:30 p.m., appellant arrived at one of the rooms and identified himself as a studio representative and said the men would have to "pay [the] fee before the women would be dispatched out to the motel room."[4] Lindsey told appellant he would not pay until the women arrived and he could see they were the ones he ordered. Appellant assured Lindsey the women would arrive. Appellant and Lindsey went to the lobby bar to discuss the matter further.

In the interim, Officer G.A. Smith had positioned himself in the lobby bar to await

a prearranged signal from Lindsey that money had been exchanged.

Lindsey did pay appellant the money—$560.00 in marked bills—and appellant gave him a receipt. Lindsey gave Smith the signal. Lindsey testified he and appellant then got in an elevator and went down to the lobby where appellant used a telephone. Lindsey claimed he was able to overhear only a part of the conversation; appellant said "the deal was on, to go ahead and send the girls." The two then returned to the bar and had a drink. According to Lindsey:

"... We talked for, oh, approximately 20 minutes about Mr. Armentrout and the Golden Girl Studios. Mr. Armentrout questioned me about the possibility of wanting to join sort of a V.I.P. membership type deal[5] and told me that he would not have to send a representative out if everything went smooth tonight. We talked about—I told him that this was Officer Grieger's bachelor party."

Appellant told Lindsey he was the owner of Golden Girl Studios. Lindsey testified he told appellant he intended to "use these girls for ... sexual intercourse, all four of them."

Shortly, the women arrived. According to Lindsey, as appellant began to depart, "he told the girls to take care of me and I already paid all my money and we left." Appellant was immediately arrested outside the hotel.

Meanwhile, up in the hotel rooms, seven or eight officers were, as Officer C.R. Barney described it, "conducting an investigation. We were disguised as having a bachelor party." On the arrival of Lindsey and the women, four officers left. The remaining officers paired with the women, in two different rooms.[6]

Asked by the prosecutor whether appellant told him "what he could use these girls for," Lindsey replied without objection, "for sexual favors."

4. No objection was raised to the admission of appellant's statements to the officers.

5. Later, Lindsey explained that appellant told him the "V.I.P. membership" was for "special members who had used his company before and that for special clients of mine or myself ... he could arrange for girls to meet us ... at any location [we would] desire...."

6. Though the testimony about who was with whom was conflicting, apparently Officers Lindsey and Roehling were in one room while Officers Grieger and Barney were in another.

Inside the room, the woman with Lindsey immediately undressed completely and got on the bed. Lindsey took off his shirt and lay down beside her. They talked about how much money she would receive of the $140.00 paid for her, and Lindsey asked her if it would cost anything more to have sex with her. Officer Roehling was in his underwear and the woman with him was nude. Lindsey could not tell what their conversation was about.

Officer Grieger testified that after Lindsey brought two women to his and Barney's room, one of the other women came in wrapped only in a towel "and she dropped her towel and she was nude. So I suggested to the girls that were with us they ought to do the same thing, and they left and went to the restroom and took their clothes off and returned to our room." Tiffany got in bed with Grieger. He testified: "[B]y my fondling and everything we were doing, I suspect she would know what we were going to do [when] I asked her if this was going to cost anything." Grieger elaborated: "I fondled her breasts; and she let me play with them." According to Officer Barney, when the woman he was with "got nude and climbed into bed," he took off all of his clothes but his underwear. Barney testified he did not have sexual intercourse with her; asked by the prosecutor "what, if anything, occurred between you and Dawn?," Barney replied, "I made a prostitution case on Dawn."

Lindsey testified he walked across the hall to the other room "to check and see if the other prostitution cases had been made. I was not sure they had been after talking, and I couldn't say too much in front of the other women. And I went back to my room and at that time the two girls that me and Officer Grieger[7] were with were arrested for prostitution." Grieger also testified he arrested Tiffany for soliciting prostitution.

Appellant's contention, as we understand it, is that this evidence fails to reflect his awareness of "what the young ladies were going to do" or, restated, there is no evidence appellant authorized the women to commit acts of prostitution pursuant to an agency relationship. We disagree.

Appellant relies on *Clark v. State,* 158 Tex.Cr.R. 231, 254 S.W.2d 527 (1953); *White v. State,* 451 S.W.2d 497 (Tex.Cr.App. 1970); and *Chapman v. State,* 470 S.W.2d 656 (Tex.Cr.App.1971). However, in both *Clark* and *White,* supra, the records contained no independent evidence that the persons whose statements were offered were acting together with the accused, so as to render their statements admissible against the accused as exceptions to the prohibition against hearsay evidence. And in *Chapman,* supra, there was no independent evidence that the accused was acting in unlawful concert with those whose statements were offered against him.

■■■ The State must show by evidence independent of the statements of the alleged conspirators, an "acting together of the parties" and a "participation or interest of the accused in the commission of the crime." *Chapman,* supra, at 662. But this may be shown by inference from circumstances. *Mutscher v. State,* 514 S.W.2d 905 (Tex.Cr.App.1974).[8] Appellant's telephone call to the effect that "the deal was on, . . . go ahead and send the girls" after he had received money, coupled with his statement to the women on their arrival, that they should "take care of [the men who had] paid all [their] money" *after* Officer Lindsey told appellant all of the women would be "used for sexual intercourse," constitute ample circumstantial evidence that appellant and the women were acting together in an unlawful venture. See and compare *Aguero v. State,* 164 Tex.Cr.R. 265, 298 S.W.2d 822 (1957).

Appellant's third, fourth and fifth grounds of error are overruled.

---

7. Apparently Lindsey meant Officer Roehling.

8. "Conspiracy is an offense which can ordinarily be established only by a great number of apparently disconnected circumstances. Necessarily the existence of the conspiracy in most cases can be made to appear only inferentially from the acts of the parties committed in furtherance thereof." *Mutscher,* supra, at 912.

Appellant's first and second grounds of error contend the evidence is insufficient to show, respectively, he knowingly owned a prostitution enterprise and that the enterprise he owned used two or more prostitutes.

Though not defined by our penal code, "prostitution enterprise," as used in § 43.04, supra,[9] has been construed by the Court to mean "a plan or design for a venture or undertaking in which two or more persons offer to, agree to, or engage in sexual conduct[10] in return for a fee payable to them."[11] *Taylor v. State,* 548 S.W.2d 723, 723 (Tex.Cr.App.1977).

The dispositive question, then, is whether the evidence established Golden Girl Studios—which appellant told Lindsey he owned—was a "prostitution enterprise."

Evidence which has not been recited above established that when the officers initially visited the studio and told the day manager, Mr. Below, they wanted four girls for sexual favors at a bachelor party the following night, he said he "knew what [they] were talking about" and set a fee at $35.00 an hour, minimum of two hours per woman. The officers were told one half of the fee must be paid in advance.

Lindsey returned the next day in the early afternoon and spoke with a new person who said the price had changed to $70.00 an hour, but that no money was due until the women arrived. Later, in his room at the Shamrock Hilton, Lindsey received several telephone calls from "studio representatives" and ultimately was told the women were not coming. It was shortly thereafter that appellant arrived, money was exchanged and the women came to the hotel.

Lindsey asked the woman he was in bed with how much of the $140.00 paid for her would go to her; her reply: $40.00. He asked her if it would cost him more money to have sex, and she said no, that he had already paid enough.

Officer Barney was in bed with Dawn. According to him, she told him as she got into bed that "she was there to go all the way with" him. When Barney asked her what she meant, she told him that enough money had been paid for her "to go all the way."

Officer Grieger asked Tiffany if "this" was going to cost him anything as he fondled her; she said no, it had already been taken care of.

█ The evidence is sufficient to establish that Golden Girl Studios was a "prostitution enterprise" within the meaning of § 43.04, supra.

█ As to appellant's knowledge, clearly, his instructions to the women to "take care of" the men after he had received money and been told the women would be used for "sexual favors," along with all the other circumstances shown, are adequate to exclude every reasonable hypothesis other than that he knew Golden Girl Studios was a "prostitution enterprise."

Accordingly, grounds of error one and two are overruled.

The judgment of conviction is affirmed.

**9.** See n. 1, *ante.*

**10.** "'Sexual conduct' includes deviate sexual intercourse, sexual contact, and sexual intercourse." V.T.C.A. Penal Code, § 43.01(4).

And relevant to this case, "sexual contact" is defined as "any touching of the ... breasts ... of another person with intent to arouse or gratify the sexual desire of any person." V.T.C.A. Penal Code, § 43.01(3).

**11.** Relevant to our inquiry, § 43.02 proscribes prostitution as follows:

"(a) A person commits an offense if he knowingly:

(1) offers to engage, agrees to engage, or engages in sexual conduct for a fee. * * *"