MARIO SAPET *alias* MARIO SAPET ARTEAGA V. STATE.

No. 26,662. January 20, 1954.
Appellant's Motion for Rehearing Denied
(Without Written Opinion) April 7, 1954.

*Schlesinger, Goodstein & Semaan,* by *Lionel Goodstein,* San Antonio, for appellant.

*Bill Allcorn,* District Attorney, Brownwood, *Sam Burris,* County Attorney, Alice, *Bell, Dyche and Bell,* Houston, and *Wesley Dice,* State's Attorney, Austin, for the state.

GRAVES, Presiding Judge.

The conviction is for the offense of accomplice to murder with malice; the punishment is assessed at confinement in the state penitentiary for a term of 99 years.

Appellant was indicted by a grand jury of Jim Wells County for the killing of Jacob S. Floyd, Jr., by shooting him with a gun on or about the 8th day of September, 1952.

It is shown by the second count of this indictment, same being the one upon which the conviction was had, that appellant, together with Alfredo Cervantes, had agreed to kill Jacob S. Floyd, Sr., and while Cervantes was attempting to kill him, he shot and killed Jacob S. Floyd, Jr., believing that he was shooting Jacob S. Floyd, Sr., but by mistake killed Jacob S. Floyd, Jr., the said appellant not being personally present when the offense was committed by Cervantes.

This indictment was returned by the grand jury in Jim Wells County, it being the county in which the homicide occurred, and upon proper motion, this cause was transferred to the 35th District Court in Brown County.

The facts show that on some date in September, 1952, a green Packard car was seen more than once in the vicinity of the home of Mr. Floyd, Sr., late in the afternoon. It was being driven in a leisurely manner around and about his house. Mr. Floyd had lived in this county for many years. He had two children, one a girl who was married and did not live at home. The son, Jacob, Jr., whose nickname was "Buddy," was 22 years of age and lived at home with his father. He resembled his father physically in many ways, being approximately the same weight, having a walk much like his father, and carrying his arms in a peculiar way as did his father.

About seven o'clock P.M., on September 8, 1952, Mr. Floyd, Sr. was at his home, as well as was his son. His wife had gone

to a meeting of some kind. His son's fiancee was also present at the home. The son and his girl friend left the house for about an hour or so, and certain friends visited the father for awhile. Eventually the father received a call over the telephone about nine o'clock, and recognized the voice calling him as that of Nago Alaniz, an attorney who lived in San Diego in Duval County, but who had an office for the practice of law in Alice, Texas. The said Nago Alaniz was a person of Latin-American descent.

The person calling said, "Jake, I am glad to hear your voice," and Mr. Floyd said to him, "All right, if you want to see me just come up to the house." The person at the other end of the telephone said, "No, I want you to meet me at Jewel's Drive-In; I want to talk to you right away." Mr. Floyd said, "All right, I will be right out," and said further, "Nago, I have always told you when you called me, I would come." The voice then said, "Come out right away, Jake; do me that favor," and he further said, "Come—take a taxi, come in a taxi; I don't want anybody to see you." Mr. Floyd replied, "All right, I will be right out," and the voice said, "Do me that favor, Jake, come right away."

Mr. Floyd telephoned for a city taxi, and although he had some trouble in getting one, he finally ordered a taxi to come to his residence. At the time the conversation with Nago Alaniz was going on, he noticed his son standing above him on the first or second step from the top of the stairway in his home some twelve feet away. He was looking down. Mr. Floyd then proceeded out to the front of the house and waited until a taxi came up. He got in a taxi and went down to this Drive-In and found Nago Alaniz in a car behind the Drive-In. He went over to Nago Alaniz and had with him the following conversation:

"He (Nago Alaniz) said to me, 'Jake, I have called you out here to tell you that they are going to have you killed. I cannot tell you who they are, Jake, they would kill me. Jake, you have got to believe me; they have imported two professional killers from Mexico to kill you, and to kill Judge Reams (who was then district judge of the Judicial District, including the Counties of Jim Wells, Duval, Brooks and Starr). There is a man now at your garage, waiting to kill you. I can't tell you who it is, if I did they would kill me; they would kill me if they knew I was talking to you now. It's the leaders of the New Party of Starr County, at Rio Grande City, they are the ones

that I am talking about. I have driven here at 90 miles per hour from Rio Grande City to tell you this. I do not know whether George Parr has anything to do with this, but you know that somebody is putting up the money. I want you to know that I am within the Circle; I want you to know that I am part of this; I have agreed to testify that the man that killed you was with me, and I am to be the alibi for the killer. I will give you a lead; Mario Sapet, known as the Turk, is the leader of the killers. Mario Sapet is driving a green Chrysler; no, a green Packard. Halsey Wright can find them at a motel court, or the Grande Courts.' "

It is shown by the testimony that about the time this conversation was taking place between Alaniz and Mr. Floyd, Sr., somebody fired four shots in the vicinity of Mr. Floyd's garage, two of the shots striking Jacob S. Floyd, Jr.; one in the arm and one in the head, from which shots he died the next day. However, Mr. Floyd, Sr. left Jewel's Drive-In and went to the jail to contact the sheriff, which he failed to do. Upon reaching his home, he found the boy lying on the walk close to the garage in a dying condition.

Appellant was arrested the next day in San Antonio, which was his home, and placed in jail, from which point he signed and delivered a statement to Captain Allee, a State Ranger, stating that he had loaned his car to Cervantes on September 8, 1952, and giving him authority to possess himself of a green Packard car which at the time was located in Nuevo Laredo in the Republic of Mexico. Captain Allee took possession of this car, having found it at the place designated, and brought same back to Alice. This car was identified by many people as being just like the car seen traveling about the home of Mr. Floyd prior to the time that this killing occurred. The witnesses also identified the appellant as being in company with Alfredo Cervantes at different motels and also in the city of Corpus Christi just prior to the killing. It was also shown that appellant and Cervantes were in possession of a pistol in Corpus Christi very similar to the one found in a garbage can near the body of young Floyd, which pistol was later identified by experts as being the gun from which the fatal bullets had been fired.

It was further shown that Alfredo Cervantes was seen in San Antonio on the day prior to the homicide, and that he had indicated to a witness that he had a job to do; that if he performed the job he would not return to San Antonio, but if he

failed to perform it, he would be back the next week to see the witness to whom he was talking. This was on the day of the homicide.

The case is replete with circumstances evidencing the association of appellant and Cervantes just before this offense was committed, not only in Texas, but also in Mexico. It is also shown that Cervantes has never been apprehended.

A further circumstance relative to this matter is that Mr. Floyd's home was equipped with telephones; that he had a loud-ringing attachment; and the testimony shows that the ringing of these telephones could be heard distinctly by a person within the garage of the Floyd home.

It is also fairly to be deduced from the evidence that "Buddy" Floyd was shot at about the time his father was talking to Nago Alaniz at the Drive-In; that the assassin fled immediately after the shooting, throwing his pistol in a nearby garbage can from which it was soon recovered.

It is further shown that appellant, a resident of San Antonio, held a commission as a deputy sheriff of the nearby Duval County at such time.

The basis of this indictment rests upon a conspiracy, the state claiming that such existed between Nago Alaniz, Alfredo Cervantes, and the appellant, Mario Sapet. It is observed that the first witness placed on the stand was Mr. Jacob S. Floyd, Sr., and Bill of Exception No. 1 relates to an objection on the part of the appellant to the conversation between Mr. Floyd, Sr., and Nago Alaniz, the contention being that it would be hearsay as it pertains to the appellant.

Oftentimes the practice has been to first prove the conspiracy between the parties before any testimony of such parties would be introduced, but that is not an iron-clad rule. See 18 Tex. Jur., p. 213, and cases there cited.

In the present instance, circumstantial evidence was relied upon to a great extent to show the conspiracy, and these circumstances, each a separate one, would have weight in establishing a conspiracy, and it has been done many times, that is, the declarations of the co-conspirators were first offered and afterwards, by further circumstances, the conspiracy itself is

fully established. If such circumstances do not appear, the conspiracy is not established. Of course, the court would properly look after such matter in his charge to the jury. The time of the admission of the statement of the co-conspirator is immaterial. See 11 Amer. Jur. p. 575; 15 Corpus Juris Secundum, pp. 1104-1105, secs. 73-74; also Loggins v. State, 12 Tex. App. 65, (p. 75); Davis v. State, 9 Tex. App. 363; and Cox v. State, 8 Tex. App. 254 (p. 300).

It seems evident from the above citations that in many instances the conspiracy would not necessarily have to be proven prior to the introduction of any statement of the conspirators. See Sapp v. State, 87 Tex. Cr. R. 606, 223 S.W. 459, which lays down the general principle that one who enters into a conspiracy after the same is in progress adopts all that has gone before and all that follows thereafter in pursuance of the conspiracy. We quote from the Sapp case, supra, as follows:

"Mr. Wigmore on Evidence, p. 1291, sec. 1979, lays down the rule as follows:

" 'A conspiracy makes each conspirator liable under the criminal laws for the act of every other conspirator done in pursuance of the conspiracy. Consequently by the principle already exemplified in other relations (ante, sec. 1077) the admissions of a coconspirator may be used to affect the proof against the others on the same condition as his acts when used to create other legal liability.'

"In the section 1077 referred to, Mr. Wigmore states 'that the confession of a principal is admissible, on the trial of an accessory, to evidence the commission of the crime by the principal.'

"Mr. Abbott on Evidence, p. 190, states the rule as follows:

" 'The familiar rule that, when several persons are engaged together in the furtherance of an illegal design, the actions and declarations of one conspirator, made together in pursuance of a concerted plan, and with reference to the common object, are competent against the others though not made in their presence.'

"And again the same author, on page 621, says:

" 'Slight evidence of concert or collusion between the parties to an illegal transaction admits evidence of the acts and declara-

tions of one against the others under the rule already stated on page 190.'

"Mr. Wharton in his valuable work on Criminal Evidence, p. 1431, lays down the following proposition:

" 'When several persons are proved to have combined for some unlawful purpose, any act done by one of the party, in pursuance of the concerted plan with reference to the crime charged, is the act of all; proof of such act is evidence against one and all the others.'

"The rule that the conspiracy must be established before declarations of coconspirators are admissible against appellant no longer obtains in this state, nor does the order in which evidence to show the conspiracy is admitted affect its admissibility. Nelson v. State, 43 Tex. Cr. R. 553, 67 S.W. 320; Barber v. State, 69 S.W. 515; Segrest v. State, 57 S.W. 845."

Bill No. 1 which complains of the introduction of Mr. Floyd's testimony relative to his conversation with Nago Alaniz is therefore overruled.

Bill of Exception No. 2 relates to the whole conversation that was had between Mr. Floyd, Sr. and Nago Alaniz over the telephone, and also at the Drive-In, and was a request upon the part of the appellant to have the court instruct the jury to strike all the testimony of Jacob S. Floyd, Sr., relative to his conversations with, and acts and declarations of Nago Alaniz to him, prior to and at the time the killing took place, and such bill is overruled.

Bill No. 3 relates to practically the same proposition as just above stated. We think that under the general doctrine of a conspiracy, which was afterwards proven, all the statements made by Nago Alaniz relative thereto and in pursuance thereof were admissible against Alfredo Cervantes as well as Mario Sapet, the appellant in this cause.

It was shown by circumstances that there was an agreement of some kind between Mario Sapet and Cervantes, the said Sapet furnishing the automobile, and he was also seen in company with Cervantes at certain periods of time during the existence of this common design to take the life of Mr. Floyd, Sr. It was also shown that Alaniz was familiar with Sapet, and according to his actions, was cognizant of the fact that there was a gun-

man present in the Floyd garage at such time, whose part in the conspiracy was to take the life of Mr. Floyd, Sr., and that at the proper time Mr. Floyd was to lose his life; and Alaniz was not only cognizant of the fact that the killer was hidden in the garage at the Floyd home, but he was also admitting the fact that he was to furnish the alibi that the killer was with him at the time the killing took place. The acts and declarations of the conspirators are all admissible as long as the conspiracy itself endures, and as long as any act agreed to therein has not yet been performed, such as the division of the property that might have been obtained by the conspirators in a robbery. In this instance, as long as the killer was in danger of being apprehended, Nago Alaniz's part in the conspiracy (which was to furnish him an alibi) still existed. Under the general mass of circumstances that we find in this voluminous record of 790 pages of the statement of facts, we think it has been satisfactorily shown that Alaniz was familiar with all of the facts of the conspiracy and that he agreed to enter into the common design, and that he had not repudiated his interest therein at the time of the killing.

In 15 Corpus Juris Secundum, p. 1105, sec. 74, it is said:

"A conspirator is criminally responsible for the acts of his co-conspirators which are committed in furtherance of the common design and follow incidentally as the natural and probable consequences of such design, even though he was not present when the acts were committed; but he is not responsible for independent acts of one of the conspirators, foreign to the common design."

See also p. 1107, sec. 75, idem.

The above ruling should dispose of all matters relative to the statement of Nago Alaniz.

Bill of Exception No. 5 complains because of the fact that in Mr. Floyd's testimony relative to his conversation with Nago Alaniz he testified that Alaniz had volunteered the statement that some years ago, when in an election contest someone broke into the courthouse and changed the ballots, he (Alaniz) was the one who broke into the clerk's office. This testimony was objected to at the time it was offered and the court sustained the objection to such statement and complied with the appellant's request to instruct the jury not to consider the testimony for any purpose; whereupon appellant moved the court to grant a mis-

trial because it was so prejudicial and inflammatory that the harm done thereby to the defendant could not be removed by the court's instruction to disregard such testimony, which request was overruled. The matter seems to have been inadvertently and unexpectedly placed into the record, and we think that the court's instruction to the jury to disregard the same cured the error, if such there was.

Bill No. 6 relates to the method in which Mr. Floyd detailed the conversation had between himself and Nago Alaniz at the time inquired about. We think the whole matter was admissible, and the method by which it was arrived at does not evidence any error herein. All bills relative to such matter have been examined by us and are overruled.

Bill No. 8 relates again to the introduction of the whole conversation between Mr. Floyd and Alaniz out at the Drive-In at the time that "Buddy" Floyd lost his life. We think that under the doctrine of a conspiracy herein referred to the whole conversation above set forth in this opinion was admissible upon the part of the state. It is contended, among other things, that the conspiracy, if such a one existed, had been carried out prior to the time of this conversation with Alaniz. With this we cannot agree because young Floyd was alive when his father left home and doubtless was shot just before the time of or while this conversation took place. The conspiracy had not terminated, nor had Nago Alaniz performed his part therein. There was also other testimony developed at a later point in the case elsewhere herein referred to that had weight in going to show that a conspiracy existed at the time between the parties alleged in the indictment.

To the same effect is our ruling on Bill No. 9 which relates to the introduction of the conversation complained of. We are of the opinion that such statements showed that Alaniz was not only one of the conspirators, but the statements related by him were made relative to and in pursuance of the original design of the parties to take Mr. Floyd's life. Clearly the statements were not foreign to the common design. This bill is therefore overruled, as well as Bill No. 10.

Bill No. 11 relates to the introduction of the testimony of the witness, Inez Gabriel Mendez, in which she testified that she saw Alfredo Cervantes about 10:00 or 11:00 o'clock on the morning of September 8, 1952, at her place of business in San

Antonio, Texas, and that he stated to her upon such occasion that he (Cervantes) was going to see Mario Sapet. This testimony bears the usual objection relative to the fact that no conspiracy had been established and therefore the testimony was hearsay and inadmissible. The objection was that there was no showing that Cervantes, Sapet and others had entered into a conspiracy and that Cervantes was the killer of "Buddy" Floyd. The court overruled such objection, and we think he was correct in doing so.

Bill No. 12 relates to a further question to the witness Mendez relative to a statement that Cervantes had made to her on the morning alluded to in which she replied "that she asked him (Cervantes) when he would be back and he said he had a job to do, and if he did it, he would not be back; but if he did not do it, he would be back the next week." The usual objection was leveled at this statement, but the court admitted it, and we think he was correct in doing so.

Bill No. 14 relates to the court's failure to grant a mistrial because on the trial of the case the state's witness, O. D. Kirkland, was asked on direct examination if he knew the defendant, Mario Sapet, when he saw him, to which question the witness answered, "I seen him one time; and he beat me up over an election." It is interesting to note from the statement of facts the following testimony given by this witness:

"Q. Do you know this defendant, Mario Sapet, when you see him? A. I seen him one time; and he beat me up over an election.

"COURT: Oh, oh, now—

"MR. SCHLESINGER: Now, Your Honor, we are now asking for a mistrial, * * *."

Whereupon the Court instructed the jury as follows:

"Gentlemen of the Jury, you will not consider for any purpose the statement just made by this witness."

The court overruled the motion for a mistrial and the trial then proceeded.

Although this statement should not have been made, we do not think it is of sufficient import to show that the court's prompt and proper instruction could not have removed from the minds

of the jury any impression that might have been made by Mr. Kirkland's unrequested statement.

Appellant offers the proposition that a conspiracy cannot be proven by the declarations of one of the co-conspirators. That may be true provided nothing else is found in the record relative to such conspiracy, but in this instance, we find many circumstances that are offered in corroboration of the statement made by Nago Alaniz. We find him possessed of knowledge of matters that are occurring at the time he made this statement. We also find a circumstance present at the time he communicated to Mr. Floyd the fact that the killer was hidden in the garage of his home, and during the communication of such fact, we find that the killer was actually executing his portion of the conspiracy. The conspiracy continues, however, until the final phase thereof, as agreed upon, was completed by the conspirators. According to Mr. Floyd's testimony, Alaniz's portion of the conspiracy had not yet been carried out, that is, that Floyd, Sr., should be killed and that Alaniz should furnish the alibi.

In many instances of conspiracy which we find decided by this court, it has always been held that the completion of the conspiracy to rob, for instance, carries with it the division of the property thus acquired, and until such property has been divided the conspiracy continues with the same responsibility upon the part of each conspirator until the final culmination and completion of the common design.

It is also contended by the appellant that the statement made by Alaniz to Mr. Floyd was not in furtherance of the conspiracy, but was in frustration thereof, and therefore same would not be admissible against a co-conspirator. Mr. Alaniz's portion of this conspiracy was a rather peculiar one. He had no duty to perform relative to the execution thereof, but his part of the common design began after the execution of the killer's portion thereof and his apprehension. In no way did he have any active participation in the actual killing of the person slain, but it was his duty to wait and watch and furnish the proper testimony at the proper time. We think that anything said and done in pursuance of this common design, or anything relative thereto that might be testified to by a member of such conspiracy, would be admissible.

In 18 Tex. Jur. p. 221, sec. 127, it is said:

"Where the acts or declarations of a co-conspirator occurred so near after the commission of the offense as to be a part of the res gestae, they are admissible against the defendant on trial."

See Nami v. State, 97 Tex. Cr. R. 522, 263 S.W. 595, and many cases cited in 18 Tex. Jur. supra, p. 221, sec. 127.

It is evident from the testimony herein that while Nago Alaniz was talking with Mr. Floyd, his son had been or was being shot down in the garage at his home just as Alaniz was indicating such fact to the witness at the time of the killer's presence therein.

Under the facts of this case, each of the co-conspirators who conspired to murder Jacob Floyd, Sr., became chargeable under the law for the murder by mistake of Jacob Floyd, Jr., such killing being directly incidental to and done in pursuance of the common design to kill Jacob Floyd, Sr. The conversation occurring at or about the time the killing by mistake took place, was a part of the transaction itself, and was admissible as an exception to the hearsay rule.

In Eggleston v. State, 59 Tex. Cr. Rep. 542, 128 S.W. 1105, 1111, this court said:

"Wherever the declaration or the statement of a co-conspirator, though committed shortly after and intimately connected with the main transaction, the same is always admissible as a part of the res gestae. The declaration becomes an overt act connected with and explanatory to something connected with the transaction."

In McClure v. State, 95 Tex. Cr. Rep. 53, 251 S.W. 1099, 1102, is found the following:

"What was said and done by Don McComber at his mother's house on the night of the homicide was but the development of links in the chain of circumstantial evidence against this appellant, as well as his co-conspirator, McComber. The telephoning for the service car, which was used by both appellant and McComber in leaving the vicinity of the homicide, was unquestionably admissible. McComber was found in possession of the fruits of the crime shortly after. It seems to be the rule in this state that when the acts and declarations of a co-conspira-

tor are made so near after the commission of an offense as to shed light on who are participants therein, they are admissible, * * *."

The court charged the jury as a matter of law that Nago Alaniz was an accomplice and therefore his declaration necessitated corroboration thereof. We are of the opinion that the intricate knowledge which Alaniz had of the facts that were actually being communicated at the time he made the statement of his association with the parties so charged, as well as his intimate acquaintance therewith, were of sufficient import to show that his declaration finds corroboration in the testimony of other witnesses, when utilized in connection with other proven facts therein, which tended to show that he was acting together with the parties. See 18 Tex. Jur. p. 213, sec. 122.

Relative to the proposition offered by appellant as to the testimony of the conversation with Alaniz not being shown therein as being in furtherance of the common design, we find this conspiracy to be a peculiar one. Alaniz had no duty to perform in the design to kill and he had no act to perform relative to such actual killing, his only duty being to furnish an alibi for the killer and thus assist in his release when apprehended therefor, if ever accused thereof. Undoubtedly, this was relative to and in pursuance of the criminal design, was res gestae, and as such was an integral part of the crime itself.

We think it is safe to say that a conspiracy cannot be proven upon the testimony of a co-conspirator alone; nevertheless, such a doctrine finds no application herein because of further facts being present. True, we have the co-conspirator's statement, but the same is also corroborated by, and its truth further shown by, the fact that at a point some distance from the making of this statement, and at the same time, except for a mistake in the identity of the victim, its truth was at such moment being demonstrated by the eventual working out of the conspiracy itself, its corroboration being carried out in its last details just as being delineated by the co-conspirator's statement.

This case has been carefully and painstakingly tried under the doctrine of a conspiracy and is free from material errors, due to a large extent to the trial judge who evidenced prudence and caution as well as legal knowledge at this trial.

There are many informal bills of exception contained in the record, but all of them are subject to the same rulings as that which we have stated herein relative to the formal bills.

The judgment of the trial court is affirmed.