365 So.2d 1023 (1978)
Jules BRIKLOD, Appellant,
v.
STATE of Florida, Appellee.
No. 52499.
Supreme Court of Florida.
November 9, 1978.
Rehearing Denied January 24, 1979.
Joel Hirschhorn of Hirschhorn & Freeman, Miami, for appellant.
Robert L. Shevin, Atty. Gen. and James D. Whisenand, Deputy Atty. Gen., Tallahassee and Margarita Esquiroz, Asst. Atty. Gen., Miami, for appellee.
Talbot D'Alemberte and Donald M. Middlebrooks of Steel, Hector & Davis, Miami, for Post-Newsweek Stations, Florida, Inc., amicus curiae.
SUNDBERG, Justice.
By way of direct appeal, appellant seeks to review in this Court an order of the trial court denying his Renewed Motion for Judgment of Acquittal. Because that order inherently passed on the validity of Section 811.021(1)(a), Florida Statutes (1973),[1] jurisdiction vests in this Court pursuant to Article V, Section 3(b)(1), Florida Constitution. Harrell's Candy Kitchen, Inc. v. Sarasota-Manatee Airport Authority, 111 So.2d 439 (Fla. 1959).
Appellant was charged by information with four counts of grand larceny in violation *1024 of Section 811.021, Florida Statutes (1973), and one count of conspiracy to commit grand larceny in violation of Section 833.04, Florida Statutes (1973),[2] the latter count being abandoned by the State before the case went to trial.
Because television cameras were to be present at the trial pursuant to this Court's decisions in In re Petition of Post-Newsweek Stations, Florida, Inc. for Change in Code of Judicial Conduct,[3] appellant sought by pretrial motion to have them barred. Additionally, he moved to have the jury and the witnesses sequestered. These motions were denied. However, the court did grant appellant's invocation of the Witness Sequestration Rule.
At the trial, the State attempted to show that one Jose Freire met with appellant, an insurance agent, to make applications for multiple health and accident insurance policies. The State alleged that these two men, together with Lilia Basallo, Freire's sister-in-law, conspired to stage accidents in order to receive multiple payments from various insurance companies for fraudulent claims. The record establishes that Freire approached Lilia Basallo with the idea of purchasing certain insurance policies in Basallo's name. Freire then purchased numerous policies from appellant, some of which were issued under Freire's name, nine of which were issued under the fictitious name of Jose Perez, and eleven others which were issued to Lilia Basallo. The applications for all these policies were filled out by the appellant himself in the presence of Freire who immediately thereafter signed them in the name to which they were issued. Once Freire signed the applications, appellant followed by signing them himself as the issuer of the policies, although he did not inquire as to why Freire signed Basallo's name on those applications attributable to her. Further, appellant did not ask about the health of any of the applicants or about the existence of other policies which they might have had at the time.
Lilia Basallo and Jose Freire went to Spain in December, 1974, and fabricated an accident. Upon returning to the United States, they made claims to all of the insurance companies with which Basallo was insured. Approximately five months later at Freire's instigation, Basallo feigned a second accident in Miami. Finally, also at Freire's behest, an automobile accident was staged in Miami in February, 1976. Lilia Basallo was hospitalized after each of these accidents. Freire testified that he collected most of the money as a result of the claims under the name of Lilia Basallo. There is no evidence that appellant received policy proceeds derived from any of the fraudulent claims.
Based on these facts, the jury found appellant guilty of the four counts of grand larceny with which he was charged. He was adjudicated guilty and was sentenced to a prison term of eighteen months and three-and-one-half years' probation on each count, to run concurrently with each other, in addition to a $2,500 fine.
In his appeal to this Court, appellant raises seven points for reversal. Because of our disposition of the case it is necessary only to consider appellant's Point III on appeal, which is: that the trial court erred in denying appellant's motion for judgment of acquittal, renewed motion for judgment of acquittal, and motion for new trial, on the ground that the evidence was insufficient to support a finding that he was guilty of the four counts of grand larceny with which he was charged.
We agree the evidence is insufficient to support a conviction of grand larceny and, consequently, find appellant is entitled to a judgment of acquittal. Specifically, appellant argues that the State never proved that he intended to participate in the commission of the crime of grand larceny. Appellant *1025 concedes that there was sufficient evidence to convict him of submitting false or misleading applications, which crime is punishable as a misdemeanor by Section 626.984, Florida Statutes (1973). Appellant's brief p. 41. His interest in falsifying such statements was to receive multiple commissions. However, Briklod argues the record reflects that he was not supposed to receive and did not receive one penny from the false accidents. According to appellant, such evidence weighs heavily against the conclusion that he acted with intent to commit or participate in the commission of grand larceny.
Appellee State rejects this conclusion and submits that the record contains ample evidence to sustain the jury's finding that appellant possessed the requisite intent to commit grand larceny. However, appellee relies solely on the following hearsay testimony of Freire to link appellant to the conspiracy.
[Prosecutor]: What other conversation did you have  I'm sorry, did you have with Mr. Briklod or Mr. Maero, with Mr. Briklod at that particular meeting, in reference to the policies?
* * * * * *
[Witness Freire]: To buy the insurance in the name of Basallo.
Q Whose idea was that?
A Of Maero.
Q Did he communicate that in your presence, through Mr. Briklod?
A Yes.
Q What did he say, to the best of your recollection, to Mr. Briklod about your buying the policies in the name of Lilia Basallo?
A That it was well, well.
Q Who said that?
A Briklod.
Q That it was well, well?
A Yes.
Q That what was well?
A The policies, to sell the policies for the accident.
Record, vol. V, at 916-917.
Appellee State submits that the words "well, well," in reality mean "good, good." Such interpretation is speculative at best. Witness Freire, whose native tongue is Spanish, spoke little English and, for the most part, testified through an interpreter. The quoted testimony was given through an interpreter who stated later in the record that "Ben, Ben," [sic] in Spanish could be translated either "well, well or good, good, either one." Record, vol. VI, at 1116.[4]
This ambiguous testimony was insufficient by itself to prove that appellant intended unlawfully to participate in the *1026 commission of the crime with which he was charged. However, even if such evidence were sufficient, it should have been held inadmissible. While it is true that a hearsay statement of a defendant's alleged coconspirator is admissible against the defendant if the statement is made during the pendency of the conspiracy and in furtherance of its objectives, such testimony of hearsay statements is admissible only if the conspiracy itself has been established by independent evidence, i.e., not adduced from the hearsay testimony. See Damon v. State, 289 So.2d 720 (Fla. 1973); Honchell v. State, 257 So.2d 889 (Fla. 1971); Duke v. State, 134 Fla. 456, 185 So. 422 (1938). In the case at bar, the only evidence introduced to establish the existence of a conspiracy was the aforesaid hearsay testimony.[5] To allow this testimony alone to support the existence of a conspiracy would permit "hearsay [to] lift itself by its own bootstraps to the level of competent evidence." Glasser v. United States, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). We will not sanction the use of hearsay evidence to prove the validity of the premise upon which it was admitted in the first place. To be sure, courts have frequently relaxed the normal requirements for the order of proof,[6] provisionally admitting evidence falling under the coconspirator rule, subject to the later introduction of independent proof of the conspiracy. However, if such independent proof is not forthcoming, a curative instruction will generally be given later by the court to disregard it against all but the declarant. See Parente v. United States, 249 F.2d 752, 754 (9th Cir.1957). As Justice Jackson stated in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring specially):
When the trial starts, the accused feels the full impact of the conspiracy strategy. Strictly, the prosecution should first establish prima facie the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of its execution are admissible against all. But the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury, cf. Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 257, 92 L.Ed. 154, all practicing lawyers know to be unmitigated fiction. See Skidmore v. Baltimore & Ohio R. Co., 2nd Cir., 167 F.2d 54.
Here, a curative instruction would have been meaningless because without the admissibility of the hearsay testimony, there was insufficient evidence to support a finding of guilt as to the grand larceny charges.
Because we find that the evidence adduced was insufficient to establish appellant's guilt for grand larceny, we are compelled to reverse his conviction. As a result, *1027 we need not consider the constitutional issues raised by appellant. State v. Dye, 346 So.2d 538 (Fla. 1977); Singletary v. State, 322 So.2d 551 (Fla. 1975); Peoples v. State, 287 So.2d 63 (Fla. 1973); Walsingham v. State, 250 So.2d 857 (Fla. 1971).
The judgment is reversed and this cause is remanded to the trial court with directions to enter a judgment of acquittal.
It is so ordered.
ENGLAND, C.J., and ADKINS, BOYD, OVERTON, HATCHETT and ALDERMAN, JJ., concur.
NOTES
[1] § 811.021, Fla. Stat. (1973), was transferred and slightly amended by Ch. 74-383, § 40, Laws of Fla., and now appears as § 812.021, Fla. Stat. (1977).
[2] This enactment was repealed by Ch. 74-383, § 66, Laws of Fla., effective July 1, 1975, and reenacted in a slightly amended form as § 777.04(3), Fla. Stat. (1975).
[3] 347 So.2d 404 (Fla. 1977); 347 So.2d 402 (Fla. 1977).
[4] We note from the transcript of testimony that witness Freire gave the following hearsay testimony suggesting appellant intended to participate in the conspiracy:

"Q [Prosecutor] What did Mr. Briklod, with Mr. Maero, say to Mr. Briklod?
A That my sister-in-law was going to go to Spain and have an accident so that we could fill out the policies.
Q What do you mean, so that you could fill out the policies?
A I was going to buy the policies under the name of my sister-in-law.
Q Did you and Maero have a conversation to that effect? Yes or no?
A Yes.
Q Was it prior to the time Mr. Briklod arrived or was it while he was there?
A I don't understand the question.
Q Was the conversation which you had with Mr. Maero, in reference to the accident, during the time that Mr. Briklod was there or  when he was not there?
A First, Maero told me to do this and then afterwards 
[Defense counsel]: I object, move to strike anything Maero told him to do, not in the presence of this witness.
[Prosecutor]: Well, now, wait a minute, Judge 
THE COURT: Under the exception?
[Prosecutor]: Yes.
[Defense counsel]: Under whose , what Maero said too, Your Honor,  could we have a side-bar?"
Record, vol. V, at 911-912.
The State does not appear to rely on this testimony in its brief apparently recognizing that it is not clear whether appellant was even present when Maero mentioned that Basallo was going to Spain to fabricate the accident.
[5] We note that diverse courts have required different quantums of proof of the existence and membership of a conspiracy in order to obtain the admission of hearsay testimony. Some courts have stated that the prosecution need not make the showing beyond a reasonable doubt. See United States v. Geaney, 417 F.2d 1116 (2d Cir.1969); State v. Nirschl, 208 Kan. 111, 490 P.2d 917 (1971). In Oklahoma only slight evidence is enough. Burns v. State, 72 Okla. Cr. 432, 117 P.2d 155 (Crim.App. 1941). Other courts seem to require a prima facie showing. United States v. Cravero, 545 F.2d 406 (5th Cir.1976), cert. denied, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). Regardless of what the test should be in this State, we find that in the instant case there was not even slight admissible independent evidence of the existence of a conspiracy.
[6] See e.g., United States v. Sansone, 231 F.2d 887, 893 (2d Cir.1956), cert. denied, 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956); Sapet v. State, 159 Tex.Crim. 620, 266 S.W.2d 154 (Crim.App. 1954).