Julian Moreno MORENO, Appellant,

v.

The STATE of Texas, Appellee.

No. A14–87–583–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 20, 1988.

Mike Degeurin, Houston, for appellant.

John F. Carroll, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and MURPHY and ROBERTSON, JJ.

## OPINION

MURPHY, Justice.

Julian Moreno Moreno appeals his felony conviction for the offense of delivery of over four hundred grams of the controlled substance cocaine. TEX.REV.CIV.STAT.ANN. art. 4476–15 § 4.03(c), (d)(3) (Vernon Supp. 1988). A jury found him guilty, sentenced him to life imprisonment in the Texas Department of Corrections and assessed a $250,000 fine. We reverse the judgment of the trial court and order entry of a judgment of acquittal because there is insufficient non-accomplice evidence which tends to connect appellant with the delivery charged. TEX.CODE CRIM.PROC.ANN. art. 38.-14 (Vernon 1979).

The State alleged that on April 24, 1987, in Harris County, Texas, appellant delivered cocaine weighing at least four hundred grams by aggregate weight, to G. Mize. The indictment alleged the three means of delivery included in Article 4476–15 § 1.02(7): actual transfer, constructive transfer, and offer to sell. Officer Glenn Mize of the Texas Department of Safety had met Marla Faye Honey while working undercover on an official investigation. He purchased small amounts of cocaine from her twice. On the second occasion, March 25, 1987, Mize asked her about purchasing larger amounts. Honey, who knew Mize only as "Glenn" told him her supplier, "John," could furnish a kilogram or more and that she would inquire about the price. The supplier, John Humphries, testified as an accomplice witness at appellant's trial. When Mize contacted Honey on April 21, 1987, she informed him she could deliver two kilograms.

While he was negotiating details of the two kilo purchase in a telephone conversation with Honey on April 21, 1987, Mize also spoke with Humphries. Humphries rejected the San Antonio location Mize requested and insisted the purchase take place in Houston. Responding to questions about the quality of the cocaine he could deliver, Humphries assured Mize he "had

been dealing with the same two guys for a period of eight years to the point where he could almost speak Colombian." Mize arranged to purchase two kilograms of cocaine for $60,000 in cash. Humphries detailed how the transaction would take place: he and "one of them" would occupy a hotel room; Mize and Honey would occupy an adjoining room; a simultaneous exchange of cocaine and cash would occur through the door connecting the two rooms.

As they had previously planned, Mize met Honey at a Houston restaurant early in the evening of April 24, 1987. After Honey contacted Humphries, she and Mize each drove to a Holiday Inn, where Mize had already rented two adjoining rooms and, unknown to Honey, a third room for surveillance officers. Honey and Mize arrived at the Holiday Inn at approximately 7 p.m. and went into one of the two adjoining rooms to await the delivery. Honey telephoned Humphries twice while they waited. After speaking on the telephone to someone she called "Maureen" at 9:54 p.m., Honey told Mize "John and the two Colombians should be arriving any minute." Honey looked outside at 10 p.m. and announced "they are here."

Testimony from two surveillance officers assisting Mize shows that Humphries drove a Chevrolet Suburban automobile containing two passengers into the parking lot. Donald Keith Allen, the surveillance officer in the third room Mize had rented, testified that he looked out his window and saw Humphries park the vehicle just outside the door to Mize's room, whereupon Humphries and Hernando Dejesus Tabares left the Suburban. After they conversed briefly with the appellant, who remained seated in the front passenger seat of the Suburban, Humphries and Tabares went into the room adjoining that of Mize and Honey. One of them carried a suitcase. Agent Allen also testified that the appellant was "watching" him as Allen looked out the window.

Inside the motel, Honey went to the door connecting the two rooms as soon as she heard someone knock from the other side.

She spoke with Humphries, who asked for the money. Mize then refused to surrender the $60,000 immediately and insisted on seeing "some dope." After Honey got a package of cocaine from the adjoining room, Mize cut into it to ascertain whether it was actually cocaine and then called his "bag man" to deliver the money for the transaction, as he had told Honey he would. The "bag man" was actually Officer Allen; the request to deliver the money was Allen's signal to initiate the arrest. Shortly thereafter, several agents arrived at the scene. They arrested Humphries and Honey in the room. They arrested Tabares, who had left the motel room while the transaction was taking place, as he was attempting to flee. The appellant was arrested as he sat in the Suburban, where he had remained during the transaction in the motel. The police recovered cocaine weighing 1.0045 kilograms.

Humphries, who testified at appellant's and Tabares's trial pursuant to a plea bargain agreement with the State, identified the appellant as his supplier for this and other sales. In charging the jury, the court classified Humphries as an accomplice and tracked Tex.Code Crim.Proc.Ann. art. 38.14 (Vernon 1979). Pursuant to Article 38.14,

> [a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence *tending to connect the defendant* with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense (emphasis added).

In his first point of error, appellant maintains his conviction must be reversed and an acquittal entered pursuant to Article 38.14 because there is insufficient evidence tending to connect him to the offense, other than the testimony of Humphries. We agree. In its en banc decision in *Reed v. State*, 744 S.W.2d 112 (Tex.Crim.App.1988), the court of criminal appeals emphatically rejected misapplication of Article 38.14 by a "more likely than not" analysis and clearly stated that the statute provided the "only test" of the sufficiency of evidence to sustain a conviction when an accomplice inculpates the accused. 744 S.W.2d at 125 n. 10.

Quoting from its 1968 opinion in *Edwards v. State*, the *Reed* court reemphasized that the statute requires this court to

> eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain *if there be inculpatory evidence, that is[,] evidence of incriminating character which tends to connect the defendant with the commission of the offense*. If there is such evidence, the corroboration is sufficient; otherwise, it is not (emphasis in original, citations omitted).

744 S.W.2d at 125, quoting *Edwards v. State*, 427 S.W.2d 629, 632 (Tex.Crim.App. 1968). The *Reed* court rejected only the "more likely than not" test; it pointedly reaffirmed that the following rules, long associated with application of Article 38.14, would continue to apply:

> (1) each case must be considered on its own facts and circumstances;
>
> (2) all the facts and circumstances in evidence may be looked to as furnishing the corroboration necessary;
>
> (3) corroborative evidence may be circumstantial or direct;
>
> (4) the combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense supplies the test;
>
> (5) it is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt;
>
> (6) insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of accomplice witness testimony.

744 S.W.2d at 126. If the record shows that the accused was present, as occurred in the instant case, *Reed* also restated the familiar rule that

> [p]roof that the accused was at or near the scene of its commission, *when coupled with other suspicious circumstances*, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction.

*Reed,* 744 S.W.2d at 127, quoting *Brown v. State,* 672 S.W.2d 487, 489 (Tex.Crim.App. 1984) (en banc) (emphasis added). Similarly, proof that "someone" committed an offense, expressly insufficient under Article 38.14, can also be a factor "to be considered *along with other possible factors*" in evaluating sufficiency challenges pursuant to Article 38.14. *Reed,* 744 S.W.2d at 126 (emphasis added).

■ Because the court rejected only the "more likely than not" test and reaffirmed the rules we have set out above, Article 38.14 continues to demand that the record contain non-accomplice evidence of suspicious circumstances which independently incriminate the accused before the jury can give effect to the accomplice's incriminating testimony. *See Reed,* 744 S.W.2d at 125–27; *accord, Jackson v. State,* 745 S.W. 2d 4, 11 (Tex.Crim.App.1988) (en banc) (after eliminating the accomplice's testimony we must "examine the remaining evidence to ascertain whether it *independently* tends to connect the appellant to the *commission*" of the offense) (emphasis added).

■ In the case before us, it is undisputed that a delivery occurred and that the appellant was present as a passenger in the vehicle of an accomplice whose testimony unequivocally inculpates him. However, after considering the remainder of the record, based on the standards which *Reed* reaffirmed, we cannot say there is sufficient incriminating corroborating evidence which independently tends to connect the appellant to the delivery charged. Therefore, his conviction cannot stand.

Humphries unquestionably supplied the cocaine to the co-conspirator Honey. But while Humphries, in Honey's presence, referred to his suppliers as Colombians, nothing in the record suggests that Honey knew the identity of the person or persons who supplied the cocaine to Humphries, other than as purported Colombian nationals. Therefore, while she told Agent Mize that "John and *the two Colombians* should be arriving any minute," and, six minutes later, "*they* are here," the most her testimony establishes about the appellant is that Honey presumed the appellant was one of the two Colombians Humphries told her would soon arrive. There is no non-accomplice evidence that the two Colombians were referred to as *suppliers* on April 24, 1987, the date of the offense. While the transaction did take place in Houston as Humphries had proposed, there is nothing to show that the appellant was one of the same "two Colombians" Humphries had referred to in his telephone conversation with Agent Mize on April 21, 1987. Although circumstantial evidence can corroborate an accomplice's testimony, *Reed,* 744 S.W.2d at 126, evidence which identifies appellant only as "a Colombian" does not suffice to tend to connect him to the delivery alleged here.

Further, while a delivery did occur while appellant sat outside in the front seat of the Suburban, the record fails to reflect the *additional incriminating* circumstances which, the *Reed* court reaffirmed, Article 38.14 mandates in a "mere presence" or "mere occurrence" case such as this one. *See Reed,* 744 S.W.2d at 126–27. Although Humphries and Tabares apparently spoke to the appellant before entering the motel room, no one heard that conversation. Likewise, there is nothing to suggest that the conversation incriminates the appellant since the record indicates that the suitcase remained closed until it was opened inside the motel. Furthermore, no non-accomplice testimony suggests that appellant knew that the suitcase contained cocaine or that he even handled the suitcase. *See Sewell v. State,* 578 S.W.2d 131 (Tex.Crim. App.1979). Similarly, while the appellant "watched" Agent Allen as he looked from the third surveillance room, nothing in the record suggests that this "watching" was incriminating: he neither fled nor warned the others. Agent Allen's testimony reveals nothing suspicious about appellant's facial expression. Moreover, appellant again made no attempt to flee either when one of the co-conspirators left the hotel room temporarily or, unlike his co-defendant Tabares, when the arresting officers arrived at the scene. *See Reed,* 744 S.W.2d at 127 (noting absence of flight).

In short, the non-accomplice evidence establishes only that appellant, a Colombian, although he was a passenger in a Suburban automobile which the accomplice witness drove to a motel where a drug deal was to occur and from which the accomplice removed a suitcase without opening it, sat in that car while delivery of over a kilo of cocaine occurred inside the motel, and did not attempt to flee when arresting officers arrived at the scene. Because the record contains no additional independently incriminating or suspicious circumstances, we hold that the combined cumulative effect of such evidence does not tend to link the appellant to the offense and therefore cannot suffice under Article 38.14 to sustain his conviction. We reach this conclusion based on the *Reed* court's having rejected the "more likely than not" standard while reaffirming the traditional rules applying Article 38.14. We also note that the court of criminal appeals has consistently demanded strict proof of the accused's participation in a delivery of a controlled substance case. *See e.g., Daniels v. State,* 754 S.W.2d 214 (Tex.Crim.App.1988) (reversing, on sufficiency of evidence grounds, conviction for constructive transfer of marijuana, based on failure to show appellant had direct or indirect control over the drug, or that he knew undercover agent would be the ultimate transferee).

Because we conclude there is insufficient evidence to corroborate the testimony of the accomplice witness Humphries, we reverse the judgment of the trial court and accordingly order entry of an order of acquittal. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 59 L.Ed.2d 15 (1978); *Gibbs v. State,* 610 S.W.2d 489 Tex.Crim.App. [Panel Op.] 1980). In view of our disposition of appellant's challenge to the sufficiency of the evidence, we need not consider his second point of error.

ROBERTSON, Justice, dissenting.

The majority opinion holds that the evidence is insufficient to corroborate the accomplice witness, and, therefore orders an acquittal. I dissent because as a matter of law there is sufficient evidence, other than the testimony of the accomplice witness, that *tends to connect* appellant to the commission of the offense. This is all the law requires.

### The Accomplice Testimony

John Walter Humphries is an accomplice witness as a matter of law. He along with appellant, Hernando Tabares (who was jointly tried with appellant, convicted and given the identical sentence of life imprisonment and a fine of $250,000 that appellant received) and Marla Fay Honey were all arrested on the facts giving rise to this offense. Approximately three weeks prior to his testimony against Moreno and Tabares Humphries had entered a plea of guilty, without an agreed recommendation before the court, to the charge of aggravated delivery of cocaine and requested a pre-sentence investigation. He had never been approached by any person "offering (him) any kind of deal or asking for (his) testimony" until three or four days before he actually testified. It was then that the prosecutor came to see him in jail and the prosecutor asked him if he would testify as a witness. In return for his testimony, the prosecutor agreed to recommend a sentence of eight years confinement for the offense of nonaggravated possession of cocaine.

Humphries testified that for the approximately six month period of time prior to April 24, 1987, he was selling cocaine which he obtained from appellant Moreno. He stated that he had known appellant for approximately a year, that he had purchased a quantity of drugs from appellant about ten to twelve times, and that he always secured the cocaine from Moreno's residence. He testified that Marla Faye Honey was a lifetime friend of his and lived in San Antonio. He stated that while he was in San Antonio on approximately April 20, 1987, he received a message to contact her. He did so and she stated she had a friend that would like to purchase a large quantity of cocaine. Humphries told her that he had the contact to provide it and would let her know. They had three or

four conversations and he then had a "message on my message machine" to call her, that he did so but she was not there and her roommate gave him a telephone number to call, which he did, and spoke to a "Glen." He stated that their conversation concerned the "availability" of cocaine and that he told Glen that he was "relatively sure that I could" provide it in "bulk quantity" at "eighty percent or better in quality." He stated that "Glen" asked whether he "could conduct that deal in San Antonio and he told him he could not because he only had one quantity supply connection in Houston and that "I didn't have the cash to buy it up front. So it would have to have been a front and usually they go with you in a front." During his conversation with "Glen" he stated that he had been dealing with two Colombians for seven or eight years and that he could almost speak Colombian. He further stated to "Glen" that the actual transfer of the cocaine would take place in adjoining rooms of a hotel where the rooms were connected by a door between the two rooms. He explained that "Glen" and "one of my people" will be in one room and he and one of the suppliers would be in the other room and the cocaine and the cash would be transferred through the connecting door. Humphries stated that he returned to Houston the next day and "the first thing I did" was contact appellant "through a beeper" at a number he had to contact appellant. He stated that when appellant returned his call, he told appellant that he needed two kilos, and that appellant told him "no problem" and they agreed on a price of $25,000 per kilo. The conversation concluded with Humphries telling appellant he would call him the next day and let him know when he needed it.

The next day Ms. Honey arrived in Houston and contacted Humphries about 4 or 4:30 p.m. and he told her to get with her purchaser and set up the hotel and let him know. Humphries then contacted appellant who told him there was a problem—that he only had "half as much as what I wanted" because "it was sold overnight."

After "Glen" and Ms. Honey got set up in a Holiday Inn Hotel, she called Humphries and informed him where to come. Humphries then went to appellant's house but had to wait with appellant and Tabares for some 30 minutes for the rest of the cocaine to arrive because it was not then at appellant's house. He testified that a person he did not know eventually brought the cocaine to appellant's house and that it was wrapped in light pink birthday gift wrapping and tied with a ribbon. The cocaine was then placed in a suitcase and the three of them left in Humphries' suburban with Humphries driving, appellant in the front passenger seat and Tabares in the rear.[1] When they arrived at the Holiday Inn he and Tabares got out of the suburban and as they approached the room, Ms. Honey "stuck her head out the door next door and looked at me and I went like this and she shut the door and [I] went into the room and shut the door behind me." He then knocked on the connecting door and Ms. Honey opened it and he asked her for the money. She stated "Glen" wanted "to test it first and make sure he's not getting ripped off." Humphries then put the package back into the briefcase and he and Tabares went back to the suburban to let appellant "know what was going on" because "I didn't have the money right there." Humphries stated that appellant said "let's get it over with" and Humphries went back in by himself, Tabares then remaining with appellant at the suburban. He stated that once back inside the room he opened up the briefcase, took out the package, unwrapped it and threw the gift wrapping paper on the floor and removed two packages. He put one of the packages back in the briefcase and took the other in his hand and knocked on the door to the adjoining room. He called Ms. Honey into his room and warned her of the Colombians' worry about something going wrong, but she assured him she had already "seen the money and everything is okay." He then handed her the package, she went back into her room, and he closed the door.

1. Humphries explained how only he and Tabares were going to take the cocaine but after they got out to the car Tabares was nervous, told him to wait and that they went back inside appellant's house and it was then determined that appellant would also go on the trip.

When nothing had happened for what "seemed like several minutes", he knocked on the door and about that time he heard "these cars pull up and doors open." Suddenly the door "broke open" and Marla Faye and Glen came into the room. Glen had his gun drawn and Humphries shouted at Glen and ducked down. Marla screamed and hit his hand and the gun went up and Humphries started to run at a low crouch. Evidently one of the other officers was opening the door at that time and Humphries ran into it, knocking the gun, which he had pulled from his pocket, from his hand and almost knocking Humphries out. All were then arrested—Humphries and Ms. Honey in the room, Tabares as he was attempting to flee, and appellant as he was still seated in the front seat of the suburban. The two packages of cocaine weighing 501.6 grams and 502.9 grams making a total of 1.0045 kilograms of 97.5 percent pure cocaine was recovered, along with Humphries' pistol, the briefcase and the gift wrapping paper.

### Corroborating Evidence

There are actually four sources of corroborating evidence: (1) the presence of appellant at the scene of the offense and his actions there, (2) statements made to Agent Mize by co-conspirator Marla Faye Honey during the existence of and in furtherance of the conspiracy, (3) statements made to Agent Mize by co-conspirator John Walter Humphries during the existence of and in furtherance of the conspiracy, and (4) other circumstances occurring at the time of the arrest.

### Statement of Marla Faye Honey

Glen Mize, an officer of the Department of Public Safety for fourteen years and assigned to conduct undercover investigations in narcotics traffic for the last four of those years, testified that he was requested by law enforcement authorities in Port Lavaca to assist them in a drug investigation. It was during this investigation that he met Marla Faye Honey and he purchased 5.5 grams of cocaine from her on March 25, 1987. He stated that in investigating the drug traffic it is always important, of course, to attempt to find the source or "go up the ladder." For this reason he inquired of Marla Faye Honey about larger purchases, and she told him she could "supply a kilo or kilo amounts and that she would obtain a price for me from her supplier." While she did not tell him the last name of her supplier, she told him his first name was John. She stated, however, that her supplier was going on vacation for several weeks and she could not then arrange for the large delivery but for him to get back in touch to set up "the kilo amount." He testified that he next called her on the telephone on April 21, 1987, and inquired about "the kilo", and she stated she could deliver two kilos and that her supplier was from Houston. He stated that he told Marla Faye that he wanted the delivery to be in San Antonio but Marla Faye told him her supplier was not able to obtain that amount "unless it was in Houston." Agent Mize testified that he insisted on talking to John directly "to discuss the arrangements on how we wanted the transaction to take place." She stated he was not then present and told him to call back. Mize called back later and Honey told him to "wait a moment" and "an individual who identified himself as John" answered the phone. (The conversation with John will be detailed under the succeeding section of statements made by John Walter Humphries to Agent Mize.)

The other statements made by Marla Faye Honey to Agent Mize which corroborate the accomplice witness testimony occurred while Mize and Honey were in the hotel room awaiting the delivery of the cocaine. Agent Mize testified that after he and Marla Faye Honey arrived at the hotel room, she called John and told him they were in the room and set up. However, when the delivery had not been made for some hour and a half or so, Honey again called at 9:54 p.m. and talked to someone (not John). After concluding the telephone conversation Honey then told him "John and the two Colombians should be arriving any minute." Within about six minutes he heard a vehicle pull up, Honey.went to the "door or the curtain" and looked out, and

said "they are here." His testimony then details the events where he heard someone enter the next-door room; there was a knock on the door connecting the two rooms; Honey answered the knock; she spoke with John (calling his name), and came back asking for the money. Mize testified he told her he was not going to hand over the money "until I see the dope", that she returned to the connecting door and so informed the persons in the other room, that he then heard "opening and closing of a door." He stated that in a few minutes Honey returned to his room and handed him "the white plastic rectangular box with green outlining on it and she said "here's half of it and I will get the other half." (The remainder of his testimony concerns his cutting into the bag, informing Honey that it looked good to him "and I will call for the money." Actually the call he made was to the other agents to move in so the arrests could be made.)

### Statements of John Walter Humphries

When Agent Mize called Honey the second time at her apartment in San Antonio (for the purpose of speaking directly to John) and Honey put John on the phone, Agent Mize testified that he talked to John for a couple of minutes about the delivery of two kilograms of cocaine. He stated John said he was from Houston and that the "product ... was in good quality and he had been dealing with the same two guys for a period of eight years to the point he could almost speak Colombian." He stated that John told him the cocaine would be "80 percent or better." When Mize asked him why the delivery could not be in San Antonio, John told him "he did his thing there (Houston) and he didn't know anyone in San Antonio." When asked what "thing in San Antonio" meant, the agent stated "he couldn't supply or obtain any cocaine in San Antonio of that quantity." He testified that John stated that delivery of the cocaine would take place in a "two-room deal" where Honey and Glen would be in one room and he (John) "and one of them" would be in the other room and by doing it that way Glen would not have to part with his money

because the "money and the dope come through the adjoining door simultaneously." The only other testimony he gave concerning the issue of corroboration of the accomplice was that after the arrests were made a digital pager was found in the immediate vicinity of the suburban automobile and he identified a picture of it and its location where recovered. On cross-examination he testified that on appellant's application for a Texas driver's license he stated he was from Colombia.

### Testimony of Donald Keith Allen

Allen, an investigator with the Department of Public Safety, was a member of the investigation team at the hotel. He was stationed in the third room, or the surveillance room. He testified that he observed the suburban driven by Humphries arrive in the parking lot and park facing their room. He testified appellant was in the front passenger seat and Tabares was in the rear. He stated Tabares and Humphries got out of the suburban and, while standing by the side of the suburban, they, or one of them, was having a conversation with appellant who remained in the suburban. Humphries and Tabares then walked toward the motel rooms, where Mize was, carrying a suitcase. He stated that "I noticed that Moreno (appellant) was watching me and I looked up and I saw him looking at me, looking out the window at them and I closed the curtains and stepped back from the window." He stated that he didn't look out anymore and that in about 10 or 15 minutes he got the signal from Mize "to come on over" and he advised the surveillance unit to take their positions for the arrest. This concludes the testimony that must be examined to determine whether there is sufficient corroboration of the accomplice.

Article 38.14 of the TEX.CODE CRIM.PROC. provides that a conviction cannot be had upon the testimony of an accomplice "unless corroborated by other evidence *tending to connect* the defendant with the offense committed." (emphasis supplied). The cases are legion that in order to test the sufficiency of the corroboration, the

testimony of the accomplice will be disregarded and the remainder of the evidence will be examined "with the view to ascertain *if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense.* If there is such evidence, the corroboration is sufficient; otherwise it is not." *Paulus v. State,* 633 S.W.2d 827, 843 (Tex.Crim.App. 1981); (emphasis original); *Reed v. State,* 744 S.W.2d 112 (Tex.Crim.App.1988). Further well-established rules are set forth in *Paulus:* (1) all the facts and circumstances may be looked to in furnishing the corroboration necessary; (2) the corroborative evidence may be circumstantial or direct; (3) the combined cumulative weight of the incriminating evidence furnished by the nonaccomplice witnesses which tends to connect the accused with the commission of the offense supplies the test; (4) it is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt; (5) in applying the test of sufficiency of corroboration, each case must be considered on its own facts and circumstances, and (6) apparently insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of accomplice witness' testimony.

Rule 801(e)(2)(E), Tex.R.Crim.Ev. provides that statements made by a co-conspirator of a party during the course and in furtherance of the conspiracy are not hearsay. This rule merely adopted what had been the well-established law in Texas. *See Lapp v. State,* 519 S.W.2d 443, 446 (Tex. Crim.App.1975); *Helms v. State,* 493 S.W. 2d 227, 230 (Tex.Crim.App.1973); *Denny v. State,* 558 S.W.2d 467, 469 (Tex.Crim.App. 1977), *cert. den.* 437 U.S. 911, 98 S.Ct. 3104, 57 L.Ed.2d 1142. It is also well-established that a conspirator is criminally responsible for the acts of his co-conspirator which are committed in furtherance of the common design and follow incidentally as the natural and probable consequences of such design, even though he was not present when the acts were committed. *Sapet v. State,* 159 Tex.Cr.R. 620, 266 S.W.2d 154, 159 (1954). All statements made by a co-conspirator up until the time the object of the conspiracy is completed are admissible. *Brown v. State,* 576 S.W.2d 36, 41 (Tex.Crim.App.1979).

Finally, as to the weight to be given to the presence of an accused at the scene of the commission of an offense, the court of criminal appeals stated the rule succinctly in *Graham v. State,* 643 S.W.2d 920, 925 (Tex.Crim.App.1981): "Proof that an accused was at or near the scene of a crime at or near the time of its commission may tend to connect the accused with the crime so as to furnish sufficient corroboration [of an accomplice witness] to support a conviction."

Considering the evidence detailed above in the light most favorable to the jury verdict, which we must do (*McGoldrick v. State,* 682 S.W.2d 573, 577 (Tex.Crim.App. 1985)), and giving due regard to the principles of law visited above, I conclude that the evidence is *abundantly* sufficient to corroborate the accomplice witness. First, there is the testimony of Agent Mize of the statements of Marla Faye Honey made to him: (1) that her supplier was from Houston, and (2) that the transaction could not occur in San Antonio because her supplier could not obtain that amount unless the transfer occurred in Houston (this is cogent circumstantial evidence because at $25,000 to $30,000 per kilo for cocaine the only reasonable conclusion is that the supplier will not part with the cocaine until he has the money in hand); (3) the testimony of Agent Mize that while in the hotel room and after the cocaine had not arrived for some hour and a half, Honey made a telephone call in his presence and after talking to someone, told him "John and the two Colombians should be arriving any minute" and (4) the testimony of Mize that shortly thereafter he heard an automobile; Honey looked out and she said "they are here" (and in fact John Humphries, her supplier who could not supply a kilo amount in San Antonio, arrived with the two Colombians.)

Second, there is the testimony of Agent Mize of the statements of John Humphries made to him: (1) that he was from Houston where his supplier was from; (2) that he

could not deliver a kilo amount or more in San Antonio because he did not have the cash to buy it up front, that "he did his thing in Houston," that the transfer would have to occur in connecting hotel rooms so that there could be a simultaneous transfer of the cocaine and the money and that his supplier would accompany him at the time of the transfer; (3) that one of his suppliers would be in the room with him while the purchaser (the agent) would be in the connecting room with Honey; (4) that the cocaine would be 80 percent pure or better (this is strong circumstantial evidence to show Humphries' supplier was a major source for cocaine because of the high quality and the large amount available.)

Third the evidence that Humphries and Taberas, while outside the suburban, were observed talking to appellant who was seated inside the suburban. The jury was warranted in believing that Taberas and Humphries did in fact return to receive additional instructions from appellant after Mize insisted on testing the cocaine prior to releasing any money because to have released the cocaine would have been totally contrary to the directions given by Humphries as to the manner in which the transfer would occur. Fourth, the evidence shows that appellant was originally from Colombia. Fifth, the jury was warranted in believing that appellant was keeping a lookout while he remained in the suburban. Sixth, and while it is admittedly weak, the jury was entitled to consider, for what it was worth, the recovery of the digital pager on the ground near the suburban (Humphries testified he contacted appellant through the pager.) Finally with all this evidence in mind, there is the damning evidence of appellant's presence at the scene of the offense.

When all of this evidence, the circumstances and the reasonable inferences resulting therefrom are considered, I believe the evidence is definitely sufficient to corroborate the accomplice witness. Because the majority holds otherwise, I dissent.